2021 UT App 77

## THE UTAH COURT OF APPEALS

LISA P. MINER,
Appellee,
*v.*
JOHN E. MINER,
Appellant.

Opinion
No. 20200098-CA
Filed July 15, 2021

Fifth District Court, St. George Department
The Honorable Jeffrey C. Wilcox
No. 174500373

Troy L. Booher, Julie J. Nelson, and Rodney R.
Parker, Attorneys for Appellant

N. Adam Caldwell, Attorney for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGE
JILL M. POHLMAN and SENIOR JUDGE KATE APPLEBY concurred.[1]

HARRIS, Judge:

¶1     John E. Miner appeals several aspects of a comprehensive
set of rulings issued following a four-day divorce trial and post-
trial proceedings; his chief complaints have to do with the trial
court's award of alimony to his ex-wife, Lisa P. Miner. We affirm
the court's orders in many respects, but reverse certain parts of
the alimony award and the court's attorney fees determination,
and remand for further proceedings.

---

1. Senior Judge Kate Appleby sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

BACKGROUND

¶2 John and Lisa[2] married in 1997, while John was in medical school. During the course of the marriage, John developed a highly successful anesthesiology practice, with his income generally rising over time; in the marriage's final years, the family earned, from all income sources, just shy of $1 million per year. John and Lisa have four children together, three of whom were minors at the time of trial and two of whom are still minors today.

¶3 The Miner family, and Lisa in particular, are equine enthusiasts and for years have owned horses. In 2007, at the total price of $2.6 million, the family completed construction of and moved to a property they colloquially refer to as "the Farm." Situated on twenty acres of land, the Farm included both a 7,000-square-foot house and extensive equestrian facilities, including an "eight-stall barn" that was built with the intention—at least in part—to allow the family to "make money" from "board[ing] horses." Maintenance of the Farm was expensive; mortgage payments alone were in excess of $16,000 per month, and it cost another $3,000 per month, on average, to cover utilities and other maintenance costs. John described the Farm as "a wonderful place" that "provided a lot of joy for [the] family," but acknowledged that "it was over-the-top expensive."

¶4 In addition to their equestrian activities, members of the Miner family also enjoy other expensive hobbies. For instance, three of the children, as well as John, "are avid tennis players";

2. In this opinion, we follow our standard practice of referring to the parties by their first names when they "share the same surname, . . . with no disrespect intended by the apparent informality." *See, e.g.*, *Brown v. Brown*, 2020 UT App 146, ¶ 1 n.1, 476 P.3d 554.

two of the children—the ones that are currently still minors—are particularly active in the sport, and have "aspirations to play . . . in college." As a result, the cadence of the family's schedule often revolves around the children's tennis activities, including not only practices with expensive private coaches but also frequent tournaments, many of which involve travel to other cities. And while the family's travels often involve tennis—including an expensive annual "pilgrimage" to a professional tournament in California—they sometimes travel for pleasure as well, including trips to Europe and other international destinations.

¶5      In order to meet the "exorbitant" costs of maintaining the family's lifestyle, during the marriage John maintained an aggressive and "erratic" work schedule, sometimes working sixty to ninety hours in a week. Although it is not unusual for anesthesiologists to work odd shifts with long hours, John chose to work more than any other partner in his practice and often volunteered for procedures that paid at a higher hourly rate, making him "the top wage earner" in his practice for twelve years running. From his medical practice, John earned on average about $900,000 per year in the last three years of the marriage. Anesthesiologists are "paid based on time and the type of case," meaning that, in large part, John's earnings were "based on the amount of time that [he] put in." John had significant involvement with the children when he was at home—for instance, he helped with homework and coached their sports teams—but due in part to John's heavy work schedule, Lisa managed the lion's share of the day-to-day childcare duties.

¶6      Lisa has a bachelor's degree in exercise science and a master's degree in athletic training, but she has never worked as an athletic trainer or exercise specialist, choosing instead to devote her time to raising the parties' children. After the family finished building the Farm, Lisa began to earn an income as well,

mostly by boarding horses and offering lessons as a dressage and horse riding instructor. In the last few years of the marriage, her average annual revenue from teaching lessons and boarding horses was approximately $32,000.

¶7     In April 2017, Lisa filed for divorce, citing (among other things) irreconcilable differences. Lisa sought primary physical custody of the children, child support, alimony, and equitable division of the marital property. Some months later, the trial court entered an initial bifurcated divorce decree and two sets of temporary orders. Under those orders, Lisa and John were awarded joint physical custody, with Lisa the primary physical custodian, and with John exercising parent-time pursuant to section 30-3-35.1 of the Utah Code. John was to pay the parties' monthly bills, and Lisa was allocated $3,000 per month for other expenses. The court also ordered the parties to sell the Farm, which they did.

¶8     Soon thereafter, the case proceeded to a bench trial, which was held during four trial days spaced out over several months in mid-2018. During the trial, the court heard testimony from Lisa and John, as well as several other individuals, most notably a forensic accountant (Accountant)—who testified about a report (the Report) he had prepared regarding "marital income, marital expenditures," and valuation of marital property, including valuation of John's medical practice—and Lisa's brother (Brother), a fellow anesthesiologist in John's medical practice, who testified about the nature of the medical practice and its typical business expenses. After trial, the court issued a lengthy oral ruling stating its findings and conclusions; the ruling was later memorialized into written findings and a supplemental decree of divorce that were entered on December 31, 2018.

¶9     We will discuss some of the particulars of the court's ruling in more detail below, on an issue-by-issue basis. But in broad strokes, the court ruled in relevant part as follows: (a) the

parties were "awarded joint legal and physical custody of the[] minor children," with Lisa the primary physical custodian, and with John awarded six overnights in each fourteen-day period, although the court stated that equal parent-time should ultimately "be the goal"; (b) John's income, for purposes of the child support and alimony calculations, was set at $75,000 per month; (c) Lisa's income, for those same purposes, was set at $1,500 per month; (d) based on those calculations, John was ordered to pay monthly alimony to Lisa in the amount of $18,690 for twenty years, unless terminated earlier "upon the death of either party, or upon [Lisa's] remarriage or cohabitation"; and (e) each party should pay his or her own attorney fees.

¶10    After the ruling, both parties filed post-trial motions and, following two hearings on these motions, the court made four additional rulings pertinent to our review: (i) it reiterated the length and duration of its original alimony award, declining to grant John's post-trial request to shorten the alimony period and craft a rehabilitative alimony award; (ii) it applied its alimony award retroactively to cover the months when its temporary orders were in effect, and determined that Lisa was entitled to $66,072.80 in retroactive alimony; (iii) it reiterated its order that each party pay his or her own attorney fees, despite John's post-trial argument that he had, in effect, paid for a large portion of Lisa's attorney fees during the proceedings and had not been credited for doing so; and (iv) it altered its previous parent-time order to impose an equal parenting arrangement, wherein each party would have the children for seven overnights during each fourteen-day period.

ISSUES AND STANDARDS OF REVIEW

¶11    John now appeals the trial court's rulings, and presents two principal issues for our review. First, he challenges several aspects of the trial court's alimony award. Where such challenges are preserved, we review all aspects of the trial

court's "alimony determination for an abuse of discretion and will not disturb its ruling on alimony as long as the court exercises its discretion within the bounds and under the standards [our supreme court has] set" and so long as the trial court "has supported its decision with adequate findings and conclusions." *Dahl v. Dahl*, 2015 UT 79, ¶ 84, 459 P.3d 276 (quotation simplified). However, John acknowledges that some of his challenges to the court's alimony award are unpreserved, including some of his challenges to certain line items in the court's calculation of Lisa's needs. At John's request, we will review these unpreserved challenges for plain error. *See Vanderzon v. Vanderzon*, 2017 UT App 150, ¶¶ 37–39, 402 P.3d 219. "To demonstrate plain error, [an appellant] must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *Id.* ¶ 32 (quotation simplified).[3]

¶12    Second, John challenges the court's attorney fees ruling, which we review for abuse of discretion. *See Roberts v. Roberts*, 2014 UT App 211, ¶¶ 7, 27, 335 P.3d 378 ("In divorce cases, both the decision to award attorney fees and the amount of such fees

---

3. Our supreme court has recognized the "ongoing debate about the propriety of civil plain error review," but has not yet taken the opportunity to resolve that debate for purposes of Utah law. *See Utah Stream Access Coal. v. Orange St. Dev.*, 2017 UT 82, ¶ 14 n.2, 416 P.3d 553. We decline to engage in that debate here, chiefly because Lisa does not ask us to—indeed, both parties appear to assume the propriety of plain error review in this case. Utah appellate courts have applied plain error review in civil cases in which neither party challenges its application, *see, e.g.*, *Hill v. Estate of Allred*, 2009 UT 28, ¶¶ 30–31, 216 P.3d 929; *Vanderzon v. Vanderzon*, 2017 UT App 150, ¶ 39, 402 P.3d 219, and we do so here without opining on the propriety of that review.

are within the trial court's sound discretion." (quotation simplified)).[4]

ANALYSIS

¶13 We begin with John's multifaceted challenge to the court's alimony award, analyzing each aspect of his challenge in turn. We then address John's challenge to the court's attorney fees order.

## I. Alimony

¶14 Under Utah law, "the primary purposes of alimony . . . are: (1) to get the parties as close as possible to the same standard of living that existed during the marriage; (2) to equalize the standards of living of each party; and (3) to prevent the recipient spouse from becoming a public charge." *See Rule v. Rule*, 2017 UT App 137, ¶ 14, 402 P.3d 153 (quotation simplified). "Alimony is not limited to providing for only basic needs but should be fashioned in consideration of the recipient spouse's station in life in light of the parties' customary or proper status or circumstances, with the goal being an alimony award calculated to approximate the parties' standard of living during the marriage as closely as possible." *Id.* (quotation simplified). During their marriage, John and Lisa enjoyed a very comfortable lifestyle and high standard of living, and to allow Lisa to participate in that lifestyle following the divorce, the court ordered John to pay Lisa $18,690 per month in alimony for a twenty-year period.

---

4. John also argues that the trial court erred by dividing the assets in the parties' joint checking account by using a balance from March 2018 rather than September 2018. Because this issue resolves itself in light of some of our other rulings, we discuss it only briefly, *see infra* note 11.

¶15　John advances a three-part challenge to the alimony award. First, he takes issue with the amount of that award, and contends that the court erred in its calculation of Lisa's demonstrated needs, Lisa's potential income, and John's potential income. Second, he challenges the duration of the award, asserting that the court should not have awarded Lisa alimony for twenty years—the length of the marriage—but instead for a shorter "rehabilitative" period. Finally, John takes issue with the court's decision to make the alimony award retroactive to cover the temporary orders period. We address each of these challenges, in turn.

A.　　Amount of Alimony

¶16　The appropriate amount of any alimony award is governed by a multi-factor inquiry, first articulated in *Jones v. Jones*, 700 P.2d 1072 (Utah 1985). *See id.* at 1075. Now expanded and codified in statute, *see* Utah Code Ann. § 30-3-5(8)(a)(i)–(vii) (LexisNexis 2019), the first three factors—the so-called "*Jones* factors"—require a court to examine "(i) the financial condition and needs of the recipient spouse; (ii) the recipient's earning capacity or ability to produce income; [and] (iii) the ability of the payor spouse to provide support," *Dahl v. Dahl*, 2015 UT 79, ¶¶ 94–95, 459 P.3d 276 (quotation simplified).

¶17　"A party seeking alimony bears the burden of demonstrating to the court that the *Jones* factors support an award of alimony." *Id.* ¶ 95. "To satisfy this burden, a party seeking alimony must provide the court with a credible financial declaration and financial documentation to demonstrate that the *Jones* factors support an award of alimony." *Id.* ¶ 96. "And in all cases" the trial court "must support its [alimony] determinations with adequate findings," *Rule*, 2017 UT App 137, ¶ 22, "on all material issues," *Howell v. Howell*, 806 P.2d 1209, 1213 (Utah Ct. App. 1991) (quotation simplified). "Failure to do so constitutes reversible error, unless pertinent facts in the record are clear,

uncontroverted, and capable of supporting only a finding in favor of the judgment." *Id.* (quotation simplified).

¶18 "In many cases, the level of expenses and the standard of living of the separated parties at the time of trial will not be representative of the parties' customary or proper status or circumstances" during the marriage. *See Rule*, 2017 UT App 137, ¶ 16 (quotation simplified). "Our precedent thus reflects and reinforces the general rule that alimony should be based upon the standard of living the parties established during the marriage rather than the standard of living at the time of trial." *Id.* ¶ 15. "We have therefore cautioned against determining alimony based upon actual expenses at the time of trial because . . . a party's current, actual expenses may be necessarily lower than needed to maintain an appropriate standard of living for various reasons, including, possibly, lack of income." *Id.* ¶ 16 (quotation simplified); *see also* Utah Code Ann. § 30-3-5(8)(e) ("As a general rule, the court should look to the standard of living, existing at the time of separation, in determining alimony . . . ."). However, in appropriate situations with regard to certain line items, a court may apply "equitable principles," in its discretion, to "base alimony on the standard of living that existed at the time of trial." *See* Utah Code Ann. § 30-3-5(8)(e); *see also Degao Xu v. Hongguang Zhao*, 2018 UT App 189, ¶ 21, 437 P.3d 411 ("[A] trial court may, in its discretion, assess some of the parties' expenses as of the time of separation, but nevertheless assess other expenses as of the time of trial.").

¶19 With these principles in mind, we turn to John's challenge to the amount of the alimony award, which also breaks down into three parts: John challenges the court's computations of Lisa's needs, Lisa's income and earning capacity, and John's income and earning capacity. We address John's arguments in that order.

1. Lisa's Needs

¶20    As part of its overarching ruling awarding Lisa monthly alimony of $18,690, the court determined that Lisa's reasonable monthly expenses, measured with the marital standard of living in mind, were $26,000. That figure, in turn, was the sum of forty-five separate line-item determinations, most of which John does not challenge. However, John raises eleven separate criticisms of the court's computation of Lisa's expenses, asserting that the court's awards in certain categories "were unsupported by any documentation or corroborating evidence," and that other awards exceeded what was supported in the evidence. We address each of these challenges, but first pause to describe, by way of background, how Lisa developed many of the expense computations she included in her financial declarations and about which she testified at trial.[5]

¶21    In early 2018—after Lisa had filed for divorce but before trial—John and Lisa jointly hired Accountant to create the Report, in which he itemized the parties' past and future estimated monthly expenses, and valued their marital property, including John's business. In describing the process of preparing the Report, Lisa testified that she and Accountant gathered credit card statements, bank statements, and "everything we could possibly find" for "every month in 2015 and '16." Once they had the documents, they "spent several hours over many days" going over "every single transaction and expense for 2015 and '16" and "placing them into categories." The Report was admitted into evidence, and served as the primary support for the expense line items on Lisa's financial declarations. In

---

5. Our analysis is complicated by the fact that—as mentioned, *supra* ¶ 11—some of John's challenges to particular line items are preserved and some are not, and we note at the outset of each discussion whether that particular challenge was preserved.

addition, both John and Lisa testified as to different aspects of their marital standard of living, and Lisa also testified extensively about several of the line items in her expense requests.

*a.      Tennis Expenses*

¶22   The trial court allocated $1,000 per month to Lisa for tennis-related expenses, an allocation John asserts was "unsupported by any documentation or corroborating evidence." This challenge is preserved, so we review for abuse of discretion.

¶23   John correctly points out that Lisa did not include a tennis-related line item in her financial declarations, nor was it included in the Report. However, in her closing argument memorandum, Lisa requested $1,000 per month to be used for "Tennis Coaching/Tennis Tournaments & Travel," and the trial court granted this request in full, without elaboration in its written findings as to what the funds were intended to cover. Yet it is clear from Lisa's testimony and evidence for other line items (which went unchallenged by John) that this tennis-specific line item was not intended to include money for Lisa to buy the children tennis-related clothing, or to pay for gasoline and other expenses related to transporting the children to tennis activities.

¶24   John challenged this line item in a post-trial motion, asserting that because he had "agreed to pay for all tennis-related items and the court awarded him the money to do so," Lisa had no need for funds to be allocated toward tennis expenses. In the back-and-forth associated with that motion, it became clear that the line item was meant to include expenses for tennis camps, lessons, rackets, and other tennis-related costs; Lisa acknowledged that John was paying most of these expenses, but she argued that the court should allow her to have a budget for some of them—and not run them all through John's side of

the finances—so that she would not end up "stuck at home while [John] is . . . the only one that gets to . . . participate in these [tennis] activities that" the family had "historically all shared and enjoyed in." The trial court was persuaded by that argument, at one point stating that it was awarding this particular line item to Lisa so that she—like John—could have some ability to spend money on "tennis for the kids," and stating, by way of example, that Lisa could use the money to enroll the children in a particular tennis camp, even if John did not agree to it.

¶25    There is no dispute that the costs associated with the children's tennis activities—even excluding amounts for tennis clothing, and gasoline for transportation, which are included in other categories—were a "family expense," and that the total costs amounted to, on average, somewhere around $2,500 per month. We perceive no abuse of the court's discretion in ordering that some of these expenses be routed through John's side of the finances, and some through Lisa's, in order to give both parties some measure of control over how those funds are spent. And given that the family's tennis expenses totaled some $2,500 per month, the court's choice of $1,000 for this line item was—contrary to John's assertion—well within the range supported by the evidence. We therefore reject John's challenge to the tennis expense line item.

*b.    Entertainment*

¶26    The trial court allocated $625 per month to Lisa for "entertainment," which was exactly half of what Lisa requested. John challenges this line item, asserting that Lisa failed to provide any evidence supporting it. This challenge is preserved, so we review for abuse of discretion.

¶27    When asked on direct examination what was included in this category, Lisa indicated that she was unsure, but that even her requested amount of $1,250 was "less than what [the family

had] historically spent" on entertainment. On cross examination, she was not able to cite any specific examples of what she intended to include in that category, but testified that she and Accountant had derived the number by going through the credit card statements and that "every single thing that was entertainment, we put in there." John asserts that this evidence is insufficient, comparing this situation to the one presented in *Dahl v. Dahl*, 2015 UT 79, 459 P.3d 276, in which our supreme court clarified that the recipient spouse needs, at minimum, *some* evidence of financial need beyond merely "unsubstantiated testimony" regarding marital expenses. *See id.* ¶¶ 108–09 (explaining that the petitioner did not meet her burden of showing financial need because "[s]he provided no financial declaration, no supporting financial documentation, and no expert testimony").

¶28   We take John's point that Lisa's trial testimony about this line item was not as specific as it could have been. But in our view, this situation is a far cry from *Dahl*. Here, Lisa's entertainment expense was supported by more than unsubstantiated testimony. As Lisa explained, the line item was created during the thorough review she and Accountant made of the family's financial documents, and the $1,250 amount appears as a line item in the Report. And our examination of some of the credit card statements admitted into evidence reveals that John and Lisa each were spending several hundred dollars every month on things that certainly appear to be entertainment-related. Indeed, John requested as much as $1,000 per month in entertainment expenses. We also note that the trial court penalized Lisa for her lack of specificity by cutting her request in half.

¶29   In the end, we consider the "entertainment" line item to be supported by sufficient evidence, and we perceive no abuse of discretion in the trial court's handling of the matter. To the contrary, we agree with its assessment that an entertainment

budget for Lisa of $625 per month was not "out of line," considering that the parties "liv[ed] on almost a million dollars a year" during the marriage.

*c.      Legal and Accounting Expenses*

¶30     The trial court allocated $200 per month to Lisa for legal and accounting expenses, cutting Lisa's request down from $333.33. John challenges this line item, again asserting that Lisa failed to provide any evidence supporting the expenses. This challenge was preserved, so we review for abuse of discretion.

¶31     Lisa explained at trial that her request for $333 per month in legal and accounting costs was based on Accountant's review of the parties' expenses, and was intended to cover her costs of "[h]aving taxes prepared, things like that," and for non-divorce-related legal fees for things that come up from time to time, as had happened occasionally during the parties' marriage. The line item appeared in the Report. John protests that this amount is not intended to cover any of the attorney fees incurred in the divorce case—indeed, those are discussed separately in this opinion, *see infra* part II—and that Lisa presented no evidence that she would have any legal expenses after the divorce was over. The trial court appeared to take John's point about attorney fees, and on that basis cut Lisa's allocation from $333.33 to $200, but still found that Lisa needed some money for legal fees and accounting fees combined, offering its view that Lisa "was going to need some accounting help" that consisted of "more than [simply] taking [her tax documents] to H&R Block," and that "$200 a month is fair" for someone in that situation to pay for accounting services.

¶32     John contends that this amount is too high, but he supports that contention only with a bare assertion that tax preparation costs for many people typically amount to only "a couple hundred dollars *per year*, not per month." John makes no effort to engage with the trial court's viewpoint that, given the

nature of these parties' finances, and the contested post-divorce situation Lisa would be in, Lisa would need more legal and accounting services than an average person might. Under these circumstances, where the line item amount was supported by Accountant's Report, as well as by Lisa's testimony, there was more than mere unsubstantiated testimony to support Lisa's request. We perceive no abuse of discretion in the trial court's determination that Lisa would need $200 per month for legal and accounting services in the future.

### d. Out-of-Pocket Health Expenses

¶33   The court allocated $727.58 per month to Lisa for out-of-pocket health-related expenses (as distinct from health insurance premiums). John challenges this line item, again asserting that Lisa failed to provide any evidence supporting it. This challenge was preserved, so we review for abuse of discretion.

¶34   For an expense category entitled "Other Health, Out of Pocket, Uninsured, Deductible," Lisa requested $8,731 annually (or $727.58 per month). When asked about this category during trial, Lisa testified that it was intended to include, among other things, money for "allergy shots" that she and two of the children receive every six weeks (which cost about $1,500 annually), and money for the children to attend counseling (which apparently costs $120 per child per session). Indeed, Lisa's requested figure is derived directly from the Report, in which Accountant concluded that the parties spent $17,462 annually on "Other Health" costs, apart from insurance premiums, and that Lisa's share of these expenses was $8,731 per year, or $727.58 per month. Based on this evidence, the trial court granted Lisa's request, allocating her $727.58 per month for these expenses.

¶35   John asserts that the trial court's allocation is unsupported by evidence, claiming that the children did not really go to counseling that often and that, in any event, the children's health

expenses would phase out over time and therefore should not be included in the alimony calculation. John's objection is unpersuasive, however, where the trial court's award is based—to the penny—on the figures generated by Accountant, which in turn were derived from the parties' expenses during the marriage. In this situation, the court's allocation is supported by ample evidence, and the court did not abuse its discretion in allocating $727.58 to Lisa in this category.

*e.      Car Payment*

¶36    The trial court allocated $833 per month to Lisa for "Existing/Replacement Vehicle Purchase." John challenges this award, asserting that it exceeds both the amount that Lisa originally requested and the amount supported in the evidence. This challenge is preserved, so we review for abuse of discretion.

¶37    In her financial declaration, Lisa listed $600 as an expense item for "Vehicle – Future Replacement." But Accountant did not include any such line item in the Report; instead, the Report indicates loan payments for two specific vehicles, and Accountant testified that he assumed, for purposes of preparing the Report, that John was making both of those payments. However, he also testified that, if Lisa was driving one of those vehicles, then it would make sense to move the payment associated with that vehicle to Lisa's column. Lisa was in fact driving one of those vehicles and, according to the Report, the monthly payment on that vehicle was $809. By way of comparison, the monthly payment on the vehicle John was driving was $890, and—as discussed below, *infra* part I.A.3.b—the court found that John should be allocated $833 for a car payment expense.

¶38    At trial, Lisa was asked about the discrepancy between the monthly payment on the car she was driving ($809) and the monthly car expense she was asking for in her financial declaration ($600), and she pointed out that the amount she was

asking for was "considerably less" than what she had been spending. Lisa even indicated that she was willing to sell that vehicle and "replac[e] [it] with something with a lower payment," and that this was the reason why she asked for only $600 for a future car payment. But despite these concessions, Lisa—in her written closing argument—requested $833 for a car payment, and the trial court ultimately allocated her that amount.

¶39 John assails the trial court's allocation for Lisa's car payment, asserting that no evidence supports the $833 allocation, and that the court abused its discretion by not selecting $600 as the appropriate amount for this line item. We disagree. That $833 figure is the same amount the court allocated to John, and is only $24 more than the amount that the family had been spending on Lisa's car payment during the marriage. While the trial court, with appropriate findings, could have awarded a lesser amount in line with Lisa's $600 request, *see Degao Xu v. Hongguang Zhao*, 2018 UT App 189, ¶ 21, 437 P.3d 411 (noting that courts have the discretion, for certain line items, to assess certain expenses as of the time of trial, rather than as of the date of separation), it is the "general rule" that "the court should look to the standard of living, existing at the time of separation, in determining alimony," *see* Utah Code Ann. § 30-3-5(8)(e) (LexisNexis 2019). We perceive no abuse of discretion in either the court's general decision to base Lisa's car payment allowance on the parties' expenses during the marriage, or in the court's specific decision to allocate $833 for that purpose—the same figure it allocated to John, and within the range ($809 to $890) that the parties had spent on each of their car payments during the marriage.

f. *Student Loan Payments*

¶40 The trial court allocated $134.75 per month to Lisa for student loan payments. John challenges this line item, asserting

that this amount exceeds what the evidence supports. This particular challenge is unpreserved, so we review for plain error.

¶41    In her financial declaration, Lisa requested an allocation of $135 per month to make payments on her outstanding student loan obligations. In his Report, Accountant determined that Lisa had $1,617 in annual student loan expenses, an amount that, paid monthly, equals $134.75. The trial court awarded Lisa the amount reflected in the Report.

¶42    John acknowledges that Lisa has legitimate student loan debt. But he contends that the total debt is less than $7,000, and at $135 per month can be paid off in about four years. John calculates that, over the full twenty-year alimony period, this line item will result in him paying Lisa more than $32,000, and will require him to make payments for Lisa's student loans long after they have been paid in full. John therefore contends that the court plainly erred by including any amount for student loan debt in the long-term alimony computation. We disagree.

¶43    In this situation, the trial court did not commit plain error by including a line item for an uncontested student loan payment. As noted above, one of the purposes of an alimony award is to "approximate the parties' standard of living during the marriage as closely as possible." *See Rule v. Rule*, 2017 UT App 137, ¶ 14, 402 P.3d 153 (quotation simplified). In assessing alimony, the trial court was tasked with looking at Lisa's needs and expenses "in light of the marital standard of living." *Id.* ¶ 15. During the marriage, and at the time of trial, Lisa had a student loan expense, and we do not consider it plain error for the court to allocate an amount for such an expense, even if it may not be certain that the expense will be present for the entire twenty-year alimony period. "Prospective changes to alimony are disfavored," although they "are appropriate" when "the future event is certain to occur within a known time frame." *See Richardson v. Richardson*, 2008 UT 57, ¶ 10, 201 P.3d 942. Given

the relative certainty of the expiration of Lisa's student loan debt, it would have been within the court's discretion to order a prospective change—had John asked for one—in John's alimony obligation in four years, when those loans will be paid off. But we cannot say that the court plainly erred by declining to sua sponte make such an order in this case.

g.      *Farm and Horse Expenses*

¶44    The trial court allocated $5,000 per month to Lisa for "Farm/Horse Expenses." This is the largest single expense category in the court's alimony award, and John challenges it on the basis that the amount exceeds what the evidence supports. This challenge is preserved, so we review for abuse of discretion.

¶45    In her financial declaration, Lisa asked for an allocation of $5,000 for "Horse care (food, boarding, veterinarian, equipment)." Lisa owned five horses during the final years of the marriage, although one horse died prior to trial, leaving Lisa with four horses at the time of trial. Accountant computed Lisa's historical expenses related to horse care and upkeep to be nearly $90,000 annually, but given that the family had been ordered to sell the Farm, Lisa recognized that her horse operations would not proceed in exactly the same manner moving forward. In light of the changed circumstances, Lisa estimated that her horse expenses, in a post-Farm world, would be $60,000 annually, or $5,000 per month. Although Accountant had solid figures to support the higher historical expense amount, he acknowledged on cross examination that the lower $60,000 figure was "Lisa's estimate," based on "historical expenses, [of] what she planned to do in the future, [and] kind of taking an amount per horse and dividing that out." He asserted that this was his and Lisa's "best shot at a reasonable estimate."

¶46    Lisa provided a document that gave a "breakdown" of estimated prices for numerous horse-related expenses, which was entered into evidence for "illustrative purposes." According

to Lisa's estimates, her horse care and maintenance expenses would, in the future, range from $4,691.25 to $5,241.25 per month. During trial, Lisa testified in detail about several of these estimated costs, including: boarding costs; hay and other feed; hoof care; lessons for Lisa to continue training the horses; vaccinations; preventive dental care; supplements, vitamins, and prescription medications; money that would allow her to have "wiggle room" for colic and other ailments that might come up; and "bridal bits, saddle bags, . . . [and other] horse-related equipment that need[s] to be replaced every so often."

¶47 The trial court recognized that John vigorously disputed Lisa's requested amount for horse care. But "after some careful analysis and looking at what the evidence was," the court ultimately found that, although it was "expensive to have horses," Lisa had owned horses "for 20 years" and opined that she should not be required to cease her equestrian pursuits merely because she was divorced. As for the amount of the costs, the court found that "$5,000 a month is needed," although it did not make any specific finding about the number of horses (whether four, five, or some other number) that Lisa would be expected to have.

¶48 John assails the allocation for horse care expenses, raising two specific challenges. First, he contends that Lisa did not produce sufficient documentation to support the $5,000 monthly figure. We disagree. The reason no historical documentation was available to support that exact figure was because the historical expenses, incurred while the family lived at the Farm, were much higher. Lisa acknowledged that the post-Farm landscape would look different, and that it would not make sense for her to be allocated the same amount for horse care in the future as the parties had spent in the past; accordingly, Lisa attempted to estimate what the new (and reduced) future expenses would be based on extrapolation from the higher historical expenses. Those estimates were supported not only by Lisa's trial

testimony, but also by a "breakdown" document setting forth each estimated expense. While expenses, for alimony purposes, are usually calculated based on historical data taking into account the parties' standard of living during the marriage, *see Rule*, 2017 UT App 137, ¶ 15, in certain instances parties may acknowledge changed circumstances, and attempt to estimate expenses moving forward, *cf.* Utah Code Ann. § 30-3-5(8)(e) (LexisNexis 2019) (stating that, in appropriate situations with regard to certain line items, a court may apply "equitable principles," in its discretion, to "base alimony on the standard of living that existed at the time of trial"). Lisa and the court properly engaged in that exercise here, coming up with a reasonable estimate for future horse care expenses that was significantly less than the historical amount.

¶49 Second, John asserts that the $5,000 amount was calculated based on five horses, and contends that this amount is too high in view of the fact that one of the horses died prior to trial, and that only two of the surviving horses were Lisa's "personal horses" (with the other two apparently sometimes used to produce income through lessons). But even if the court based its calculations on an assumption that Lisa had five horses, we see no abuse of discretion there. Lisa had at least five horses during the marriage, and John offers no good reason why the court could not have assumed, based on the standard of living enjoyed during the marriage, that Lisa would be rightfully able to replace the horse that died. And any income from the horses should be taken into account during consideration of the second *Jones* factor—Lisa's ability to earn income—and not during consideration of the expenses associated with keeping the horses.

¶50 Thus, we perceive no abuse of discretion in the trial court's allocation of $5,000 per month to Lisa for horse care and maintenance.

*h. Mortgage and House-Related Expenses*

¶51   The trial court allocated $3,500 per month to Lisa for a mortgage payment. The court's calculation assumed that Lisa would purchase a house worth approximately $750,000, and would make a down payment of approximately $150,000. John does not dispute that a $3,500 monthly payment is an appropriate allocation for a $750,000 house, but he nevertheless challenges this line item, asserting that, following the court's equitable distribution of marital property, "neither party is left with $150,000 for a down payment," and as a result "Lisa will not be able to afford a $750,000 home." This challenge was not preserved, so we review for plain error.

¶52   As noted, during the marriage the parties lived at the Farm, a $2.6 million property complete with equestrian facilities. The court and the parties acknowledged that neither John nor Lisa would be able to live in that kind of property following the divorce; indeed, the court recognized that John had made a "voluntary choice to downsize" into "a modest, . . . $345,000 home." But the court did not deem it necessary to require Lisa to make that exact same choice, instead finding it appropriate and equitable for Lisa to have the ability to acquire a $750,000 property. The court offered its viewpoint that, because Lisa "had a horse property before, . . . she should be able to continue that lifestyle, if possible." And the court ultimately "agree[d] that to get a horse property, she would need something . . . in the value of $750,000." It therefore granted her request for $3,500 per month in mortgage expenses.

¶53   In challenging the court's allocation for this line item, John does not assert that a $750,000 house is out of line for Lisa, taking into account the parties' marital standard of living. Nor does John challenge $3,500 as being an inappropriate amount for a mortgage payment on a $750,000 house. Instead, he focuses his energies on the assertion that Lisa will have only $100,000—and

not $150,000—for a down payment, and reasons therefrom that, without a $150,000 down payment, she will not be able to afford a $750,000 house, and therefore concludes that Lisa's actual mortgage payment will be lower than $3,500 per month. But John does not cite any evidence in the record supporting the notion that Lisa will not be able to purchase a $750,000 house with a $100,000 down payment. Under these circumstances, we cannot conclude that the court committed plain error in allocating $3,500 to Lisa for a monthly mortgage payment.[6]

*i.       Parenting Expenses*

¶54    John next challenges the amounts the court allocated to Lisa for food and other household expenses, pointing out that these allocations were based on the assumption that Lisa would have the minor children in her care for eight overnights during each fourteen-day period, and asserting that the court should have adjusted those line items after it changed the parties' parent-time arrangement post-trial to a true 50/50 split. This argument was preserved, so we review for abuse of discretion.

¶55    John asserts that several of Lisa's expense allocations were calculated under the assumption that she would have more parent-time than he would; by way of example, he points out that Lisa's food allocation is "2.5 times larger" than his, and that her "clothing budget [is] twice as large." John brought this issue

---

6. John also argues, in passing, that the allocations for "taxes, homeowners insurance, utilities and other home-related expenses" are also incorrect because those allocations are premised on Lisa living in a $750,000 house. However, because the court did not plainly err in making the underlying assumption that Lisa should be able to live in a $750,000 house, John's challenges to these other house-related line items fail for the same reason that his mortgage payment challenge fails.

to the trial court's attention in a post-trial motion, but the court did not grapple with John's argument that some of Lisa's line items might need to be reduced in light of the post-trial parent-time adjustment. Similarly, John raises this issue in his appellate brief, but Lisa provides no argument in response.

¶56 Given that John's argument makes intuitive sense—Lisa might need slightly less for food and other household expenses under a 7/7 parent-time arrangement than she would under an 8/6 arrangement—and given that neither the trial court nor Lisa has endeavored to explain why John's argument is wrong, we credit John's argument and remand this issue to the trial court for adjustment, or at least for an explanation as to why no such adjustment is necessary.

*j.    Retirement Savings and Asserted Mathematical Error*

¶57 Next, John asserts that the trial court made a "mathematical error" in adding the various line-item allocations for Lisa's expenses. In particular, John asserts that the individual line-items total $25,512.13, yet the trial court found that Lisa had $26,000 in monthly expenses. Thus, John asserts that the court's summed figure is approximately $500 too high. Lisa counters that there is no mathematical error but, instead, opines that the discrepancy results from a "typo" in the court's listing of her allocation for "Voluntary Retirement Savings." In Lisa's view, the court listed $2,000 for that line item in the table in its written ruling, but really intended to award $2,500; Lisa maintains that, when the correct number is used in the tally, the total is $26,012.13.[7] John did not preserve this challenge, and we therefore review only for plain error.

---

7. The other $12.13 difference is attributable to the trial court "rounding . . . down" the technical total of $26,012.13—including

(continued…)

¶58     In her financial declaration, Lisa listed $2,500 as the amount she spent as a "Retirement Contribution." And in the Report, Accountant determined that the parties had been saving approximately $54,000 per year during the marriage, and proposed that each of them be allocated $30,000 ($2,500 monthly) for "Voluntary Retirement." Lisa repeated this request in her closing argument memorandum, again asking the court to allocate $2,500 per month to her for "Voluntary Retirement Savings." John asserted at trial that retirement savings was not a legitimate need, but the court, although noting that "there is some traction to that argument,"[8] made a contrary oral finding. It opined that "it would seem prudent," based on how the parties "were living, that a $2,500 a month need to put away for savings . . . is a need." It also pointed out that John had "historically . . . been putting away $4,500 a month out of his income in retirement," and found that Lisa should be allowed to share in that opportunity.

¶59     But in the table in its written findings, the court struck through the $2,500 figure and inserted a $2,000 figure. Notably, it

---

(…continued)
$2,500 in retirement savings expenses instead of $2,000—to $26,000 in authorized monthly expenses.

8. Indeed, "the recipient spouse's need to fund post-divorce savings, investment, or retirement accounts may not ordinarily be factored into an alimony determination," and "inclusion of savings deposits as part of the needs analysis in an alimony determination is allowed only" where the court makes a specific finding that "contributing to such accounts was standard practice during the marriage and helped to form the couple's marital standard of living." *See Bakanowski v. Bakanowski*, 2003 UT App 357, ¶ 16, 80 P.3d 153. Here, the court made such a finding, and John does not challenge that finding on appeal.

also mentioned this change in its narrative written findings, specifically stating in the paragraph following the expense table that it had "reduced the proposed amount from $2,500 to $2,000." Thus, the reduction from $2,500 to $2,000 is not—as Lisa suggests—merely an unintended "typo," but appears to have been an intentional adjustment by the trial court.

¶60    The court, however, apparently neglected to re-sum all of the line items after making this adjustment. Indeed, our own review of the court's arithmetic confirms John's assertion that the court made a mathematical error, because the individual line items, when added together, total only $25,512.13. Such an error constitutes plain error—it should have been obvious to the trial court, and the error is prejudicial to John. *See Vanderzon v. Vanderzon*, 2017 UT App 150, ¶ 32, 402 P.3d 219. Accordingly, we direct the trial court, on remand, to correctly sum up the line items that constitute Lisa's reasonable expenses.

*k.    Tax-Related Expenses*

¶61    The trial court determined that Lisa would need to pay $3,416.66 per month in federal income tax, $916.67 per month in state income tax, and $116.67 per month for FICA and Medicare. John challenges these amounts, asserting that the tax computations relied on assumed income from a higher alimony amount than Lisa was ultimately awarded. This challenge was preserved, so we review for abuse of discretion.

¶62    The tax figures adopted by the court were taken directly from Lisa's financial declaration. But those figures were based on an underlying assumption that Lisa's total monthly expenses, excluding taxes, were $23,638, and that she would be receiving taxable alimony payments in excess of $28,000. The trial court, however, did not allocate to Lisa all of the amounts she had requested. In the end, the court found that Lisa's total monthly non-tax expenses were $21,062.13, and ordered that she receive taxable alimony payments of $26,000.

¶63    John asserts that the court erred by not redoing the tax computation following its downward adjustments to some of the line items in the list of Lisa's expenses. We agree. The tax figures were derived from underlying expense amounts that the court partly rejected. When adjustments are made to the amount of a recipient spouse's non-tax expenses, it becomes necessary to recalculate that spouse's tax obligations. We therefore instruct the trial court, on remand, to recalculate the tax expense line items, based both on the adjustments it already made to Lisa's expenses and failed to account for, as well as on the new adjustments that we, in this opinion, instruct it to make to Lisa's expenses and (as discussed below, *infra* part I.A.2) to her imputed income.

¶64    Thus, in sum, we sustain John's challenge to the court's findings regarding Lisa's expenses in the following particulars: (a) we instruct the court to adjust, if necessary, Lisa's food and household expense allocations based on the change to equal parent-time; (b) we instruct the court to correctly sum its line items, and correct the mathematical error; and (c) we instruct the court to recalculate Lisa's tax obligations, after making the rest of the adjustments required by this opinion. In all other respects, we reject John's challenges and affirm the trial court's determinations with regard to Lisa's reasonable monthly expenses.

### 2. Lisa's Earning Capacity

¶65    The trial court determined that Lisa was capable of earning $1,500 per month, and imputed that figure to her for purposes of the second *Jones* factor. John challenges this determination, asserting that Lisa should be deemed capable of earning more. This issue is preserved, so we review for abuse of discretion.

¶66    The second *Jones* factor requires a court to assess the recipient spouse's "earning capacity or ability to produce

income." *Dahl v. Dahl*, 2015 UT 79, ¶¶ 94–95, 459 P.3d 276 (quotation simplified). And when faced with "an underemployed spouse," a trial court "may impute income" to that spouse. *Vanderzon v. Vanderzon*, 2017 UT App 150, ¶ 63, 402 P.3d 219 (quotation simplified). "The imputation analysis involves determining whether a party is voluntarily unemployed or underemployed and, if so, how much income ought to be imputed. A person is voluntarily unemployed or underemployed when he or she intentionally chooses of his or her own free will to become unemployed or underemployed." *Christensen v. Christensen*, 2017 UT App 120, ¶ 21, 400 P.3d 1219 (quotation simplified). "Any income imputation must 'be based upon employment potential and probable earnings as derived from employment opportunities, work history, occupation qualifications, and prevailing earnings for persons of similar backgrounds in the community.'" *Vanderzon*, 2017 UT App 150, ¶ 63 (quoting Utah Code Ann. § 78B-12-203(7)(b) (LexisNexis 2012)). Furthermore, "imputation cannot be premised upon mere conjecture; instead, it demands a careful and precise assessment requiring detailed findings." *Christensen*, 2017 UT App 120, ¶ 22 (quotation simplified).

¶67 In her financial declaration, Lisa listed her occupation as "Homemaker/Part-Time Horse Boarding." At trial, Lisa indicated that she had made a deliberate choice not to seek full-time employment outside the home, choosing instead to devote her time to caring for the parties' children. Nevertheless, she was able to generate some revenue (if not profit, given the high costs of keeping horses) during the final years of the marriage through boarding horses and giving riding lessons. In 2015 and 2016, her average annual income from these activities was $32,865. But because the parties found it necessary to sell the Farm, including the equestrian facilities, no party seriously contends that Lisa should be expected, moving forward, to earn income from horse boarding and giving riding lessons.

¶68　Instead, John contends—after retaining a vocational consultant whose report was admitted into evidence—that Lisa is capable of full-time employment in several capacities (for instance, as an exercise specialist, production assembler, customer service representative, office clerk, or receptionist), and that Lisa should therefore be imputed a full-time wage. According to the consultant's report, an exercise specialist earns $35,945 per year, while the other jobs would pay between $19,280 and $20,930 per year. During examination by her own attorney at trial, Lisa was asked about these potential jobs, and she acknowledged that she "could learn" to be a receptionist; that she had the necessary skills to be an office clerk; that she "could do what was needed" to succeed as a customer service representative; and that, although she did not know what a "production assembler" was, she "could learn what [she] needed to do" in order to manage the job. Lisa pushed back, however, when asked if she could succeed as an exercise specialist, and offered her view that she did not have the necessary current qualifications and experience for that job.

¶69　The court found that Lisa was not qualified to work as an exercise specialist, stating that it was "not persuaded that [Lisa] is capable of earning the $3,000.00 to $4,000.00 [per month that John] suggests . . . , given that [Lisa] has not primarily worked outside the home, and has had no relevant work related experience in the field in which she obtained her degree in the last 20 years." However, the court made no specific finding that Lisa was unqualified for the other full-time positions. Instead, the court stated as follows:

> The Court also finds that where [Lisa] has been a full-time stay-at-home mother for the past 20 years, it is not reasonable in this case to expect that [Lisa] should go out and get a job, making her work full-time, forcing the children into further surrogate care. Thus, the Court imputes [Lisa] with $1,500.00

per month, and it will be up to [Lisa] to determine whether or not she ultimately wants to obtain employment.

¶70   John challenges this ruling, asserting generally that—especially given the equal parent-time arrangement—Lisa should be expected to work full-time, just as he is expected to work full-time, and asserting specifically that Lisa should be imputed "at least $20,600" of annual income, approximately the amount earned by a customer service representative. We agree with John.

¶71   First, as discussed more fully below, the court did not abuse its discretion by expecting John to continue to work at least full-time, as he historically has, despite the fact that he cares for the minor children on seven out of every fourteen nights. *See infra* part I.A.3.c. In this case, given that each parent is capable of full-time employment and has equal childcare obligations moving forward, it is inequitable to expect one parent to work full-time but excuse the other from any similar obligation. *See* Utah Code Ann. § 30-3-5(8)(e) (LexisNexis 2019) (explaining that in determining alimony, "the court shall consider . . . equitable principles"). The calculus may well be different in other situations, such as where one parent bears the lion's share of childcare duties. *See Rehn v. Rehn*, 1999 UT App 41, ¶¶ 4, 9, 974 P.2d 306 (stating, in a case where the payor spouse had only three overnights in a fourteen-day period, that the trial court had properly "impute[d] a lesser income to the recipient spouse so that she might give adequate care and nurturing to the parties' minor children"); *see also* Utah Code Ann. § 30-3-5(8)(a)(v) (mandating that, in determining alimony awards, a court "shall consider . . . whether the recipient spouse has custody of minor children"). But here, where childcare obligations are equal, and where neither parent labors under any particular impediment to full-time employment, we are persuaded by John's argument that Lisa should be imputed a full-time wage.

¶72     Second, with regard to which full-time wage to impute, John does not directly challenge the trial court's finding that Lisa was not qualified to assume a full-time position as an exercise specialist. But John does challenge the trial court's failure to impute income to Lisa in line with a customer service representative position, which position Lisa acknowledged she was qualified to assume. We find John's argument persuasive. A vocational consultant determined that Lisa is capable of working as a customer service representative, and Lisa herself acknowledged as much. And the trial court offered no reason—in either its oral or written findings—why Lisa's acknowledgement should not be given weight. Moreover, we cannot ascertain the source of the court's $1,500 monthly figure.

¶73     Accordingly, we conclude that the trial court abused its discretion by not imputing a full-time wage to Lisa, in line with the parties' equal parent-time arrangement and in line with Lisa's acknowledgement that she was qualified for full-time work. We therefore reverse the court's ruling on this point, and remand with instructions to impute $20,600 in annual income to Lisa—the specific amount John asks us to impute.

### 3.    John's Ability to Provide Support

¶74     The trial court determined that John's income, for purposes of the third *Jones* factor, was $75,000 per month. John challenges this determination on several grounds, all but one of which (identified below) were preserved. Thus, unless otherwise noted, we review the court's determinations for abuse of discretion.

*a.     Farm Income*

¶75     The trial court calculated John's income from the parties' tax returns from 2015, 2016, and 2017. But the amounts listed on those tax returns included not only the income John earned from his anesthesiology practice, but also income the parties earned

together from operating the Farm. In his first challenge to the trial court's computation of his income, John complains that the court improperly included Farm income in the computation, and asserts that it should have been excluded moving forward since the parties have sold the Farm. We agree with John.

¶76   We take Lisa's point that courts typically use historical averages as the starting point for calculations of income for alimony purposes. But in situations like this, where the source of part of the income is a property that the court has ordered to be sold in connection with the divorce, it may be improper to include that portion of income in the calculation. *See* Utah Code Ann. § 30-3-5(8)(e) (stating that, in appropriate situations regarding certain aspects of an alimony calculation, a court applying "equitable principles" may "base alimony on the standard of living that existed at the time of trial"). In this case, there is no evidence that John intends to attempt to earn income from equestrian-related endeavors in the future; indeed, as discussed above, the Farm has been sold and the horses now belong to Lisa. Thus, there is no evidence to support an imputation of equestrian-related income to John. We agree with John that the trial court abused its discretion in including Farm income in John's income calculation, and we direct the court, on remand, to exclude Farm income from the calculation.

b.    *John's Business Expenses*

¶77   With regard to John's income from his anesthesiology practice, the trial court recognized that John's gross income as a self-employed individual was to be "calculated by subtracting the necessary expenses required for self-employment of business operation from gross receipts." (Citing Utah Code Ann. § 78B-12-203(4).) After considering the relevant testimony and argument, the court found that the following were reasonable business expenses: $120 per month for "phone expenses"; $100 per month for "computer expenses"; $78 "per month for car insurance";

$254 per month for "vehicle gas and oil"; $330 per month for "vehicle maintenance and repair"; $100 per month for vehicle "licensing and registration"; $833 per month for a car payment; and $300 "per month for continuing medical education." The court then divided all of these expenses in half, in view of the fact that there were "both business and personal uses for" them, and determined that John's reasonable monthly business expenses were $980.

¶78    John mounts a two-part challenge to the court's assessment of his reasonable business expenses. First, he asserts that the court erred when it divided *all* of the expenses in half, including the one for "continuing medical education." This particular challenge is unpreserved, so we review for plain error. On this point, the trial court did not plainly err. Certainly, it is no abuse of discretion—and John does not contend otherwise—to divide phone, computer, and vehicle expenses in half, since those are used partly for personal use. *See Barrani v. Barrani*, 2014 UT App 204, ¶¶ 15–16, 334 P.3d 994 (recognizing that expenses that are "commonly used for personal as well as business purposes," such as a "vehicle and a cellular telephone," may not be entirely business expenses, depending on the circumstances). And in this particular case, Accountant explained that John's "continuing medical education" expenses included costs for travel, with other doctors, to medical conferences, and that certain expenditures associated with those trips—such as costs of "taking family" along or for "activities while you're there"— were more appropriately classified as personal. Given these facts, we perceive no plain error in the trial court's decision to divide the listed expenses in half.

¶79    However, we find merit in the second part of John's argument, in which he asserts that there exist other business expenses that the court improperly refused to subtract from his gross receipts, including the cost of medical malpractice insurance, overhead, and the cost of maintaining a medical

license. Lisa does not argue that these items, in the abstract, are not proper business expenses; indeed, we observe that these expenses are "necessary to allow the business to operate at a reasonable level." *See id.* ¶ 15 (quotation simplified). Instead, Lisa contends that John failed to provide the court with sufficient evidence of these expenses. We disagree.

¶80 Evidence of these expenses came not only from John, but also from Brother, one of John's partners in the medical practice. Brother testified that maintaining a medical license costs "around $400 or $500" each year, and that malpractice insurance costs "$8,500 a year," or "about $700 a month." Brother testified that, in their medical practice, overhead was "around 7 to 8 percent" of gross income. This evidence is clear, and supports John's position that these business expenses are an essential part of his medical practice, and that they have specific costs associated with them. Moreover, these expenses are entirely business-related, and not at all personal, and thus should not be cut in half. Accordingly, we conclude that the court abused its discretion by rejecting John's request that these reasonable business expenses be subtracted from his gross receipts in calculating his income.

*c.    John's Medical Income and Work Expectations*

¶81 The final—and main—challenge John makes to the trial court's computation of his income is his contention that the court's computation, including the implied expectation that John continue to work long hours, is fundamentally at odds with the court's custody and parent-time rulings, in which the court found that it would be in the best interest of the minor children for them to spend half of their time under John's care. In essence, John's argument is that, by setting his income at $900,000 annually ($75,000 monthly), the court is forcing him to continue to work sixty-plus-hour weeks, and that this will impede his ability to effectuate a 50/50 parenting arrangement.

¶82   Not all people—and not even all anesthesiologists—work as many hours as John worked during the course of the parties' marriage. As noted, John decided to work long hours, sometimes in excess of sixty hours in a week, in order for the family to be able to enjoy a very comfortable lifestyle. And John established a long-term and consistent pattern of working more than others in his practice group; indeed, he was the top wage-earner in his practice for twelve years running, a status that he earned by voluntarily working long hours and extra shifts. Over the last three years of the marriage, John earned $882,132, $979,787, and $906,199 from his medical practice (excluding the Farm income).

¶83   Under Utah law, "[i]ncome from earned income sources" is typically "limited to the equivalent of one full-time 40-hour job." *See* Utah Code Ann. § 78B-12-203(2) (LexisNexis 2018).[9] However, "if during the time before the original support order, the parent normally and consistently worked more than 40 hours at the parent's job, the court may consider this extra time as a pattern in calculating the parent's ability" to earn income. *See id.* Where, as here, there is evidence suggesting a long-term pattern of a parent (or spouse) working extended hours, a trial court does not abuse its discretion by concluding that the parent's (or spouse's) income, for purposes of child support and alimony, should be calculated with the historically longer workweek in mind. *See Tobler v. Tobler*, 2014 UT App 239, ¶¶ 27–28, 337 P.3d 296 (affirming a trial court's finding, based on evidence that the husband "normally and consistently worked" overtime hours, that the husband's income should be calculated based on the longer hours). Perhaps because of this statutory and case law guidance, John does not directly challenge the court's

---

9. "Although this section of the Utah Code addresses imputation for the purposes of child support, it is also relevant to imputation in the alimony context." *See Petrzelka v. Goodwin*, 2020 UT App 34, ¶ 10 n.1, 461 P.3d 1134 (quotation simplified).

determination that his historical work habits justify calculating his future income based on more than a forty-hour workweek.

¶84 Instead, John's challenge is subtler. He acknowledges—at least impliedly—that the trial court's income computation might have been acceptable if the court had not, at the same time, awarded him equal parent-time. In John's view, it is the combination of the court's income determination and its custody and parent-time orders that leads to problems; specifically, he contends that the court's "findings are internally inconsistent" and "impossible in practice," and that working so many hours will make him less effective as a parent. We see the matter differently.

¶85 As an initial matter, John made a decidedly different argument in the fall of 2017, during the temporary orders phase of the case, when he needed to rebut Lisa's argument that he should have only minimal parent-time in light of the demands of his job. At that time, John asked for temporary orders that gave each party "equal parent time with the minor children, to be arranged in advance but taking into account [John's] work schedule, so that [John's] parent time overlap[s] to the extent possible the blocks of time when he is not scheduled to work." And in a supporting affidavit, John averred, "Although my work schedule varies, I know what my work schedule is going to be up to four months in advance and can schedule parent time accordingly." During the year in which he took those positions, John earned $906,199 in income from his medical practice.

¶86 Moreover, if anything, the time demands that will be placed on John during his parent-time have decreased since 2017. For one thing, by the time of trial, two of the three minor children were already well into their teenage years, and the youngest was eleven. And it bears noting that the two youngest children—the two who are still minors today—are now both teenagers and are proficient college-aspirant tennis players; the

court might reasonably have assumed that these children are often in school, at tennis lessons, or otherwise engaged, and do not need constant supervision as would a toddler, for instance, and that, in a situation like this, John may well be able to work at least some hours even during the weeks when he has the children in his care.

¶87    For these reasons, we do not view the trial court's orders as necessarily inconsistent, and we do not view the tasks set before John as impossible. The trial court acted within the bounds of its discretion when it took John's temporary orders affidavit at its word, and concluded that—given his flexible work schedule, coupled with appropriate planning, foresight, and perhaps a little help from friends and family on occasion—John was up to the challenge of working his historical number of hours while at the same time having seven nights of parent-time during each fourteen-day period.

¶88    Moreover, although the trial court could have conceivably credited John's later statements—that he did not intend to keep working such long hours, that working fewer hours would make him a better parent, and that the court should assess his future income according to a lighter work schedule—the court was within its discretion to be somewhat skeptical of John's stated plans for a significant drop in income on the heels of contested divorce proceedings. *Cf. Gerwe v. Gerwe*, 2018 UT App 75, ¶ 31, 424 P.3d 1113 ("It was within the court's discretion to discredit Husband's claim that he was unable—as opposed to merely unwilling—to provide the support ordered by the court.").

¶89    Accordingly, we reject John's main challenge to the trial court's calculation of his income, but agree with John that the trial court abused its discretion by including the Farm income and excluding certain business expenses in its calculation. We remand with instructions for the court to correct these errors,

although we acknowledge that their correction may or may not affect the ultimate alimony award.

## B.    Duration of Alimony

¶90    The trial court ordered John to pay alimony to Lisa for twenty years—the duration of the parties' marriage. John challenges that determination, contending that he should not be required to pay alimony for that long, and that the court abused its discretion by not selecting a shorter, rehabilitative time period. This argument is preserved, so we review for abuse of discretion.

¶91    Our legislature has set an outer boundary on the length of alimony awards, mandating that, in the absence of "extenuating circumstances," "[a]limony may not be ordered for a duration longer than the number of years that the marriage existed." *See* Utah Code Ann. § 30-3-5(8)(j) (LexisNexis 2019). But there is no inner boundary on the length of an alimony award: a trial court may, in appropriate cases, order that alimony be paid for a shorter period, or may order that alimony payments taper off gradually. *See Gardner v. Gardner*, 2019 UT 61, ¶ 80, 452 P.3d 1134 (stating that "nothing in the [alimony] statute bars an award for a shorter duration" than the length of the marriage, and that "an alimony award for shorter than the term of the marriage should be upheld unless it results in a serious inequity evidencing an abuse of discretion" (quotation simplified)); *Boyer v. Boyer*, 2011 UT App 141, ¶ 14, 259 P.3d 1063 (stating that, "in the case of rehabilitative alimony, a gradually decreasing award may be appropriate").

¶92    Rehabilitative alimony is a remedy "intended to ease the recipient spouse's financial adjustment period." *See Boyer*, 2011 UT App 141, ¶ 15. Courts have ordered rehabilitative alimony, within their discretion, in cases where marriages are not extremely long in duration, and where the recipient spouse is of an age and in possession of employment skills that make self-

sufficiency likely. *Id.* ¶ 17; *see also Jensen v. Jensen*, 2008 UT App 392, ¶¶ 17–19, 197 P.3d 117. Rehabilitative alimony can also further important societal goals; for instance, it discourages a recipient spouse's dependency on alimony payments, and encourages self-sufficiency and independence. *See Boyer*, 2011 UT App 141, ¶¶ 4, 16–17. But courts risk abusing their discretion when ordering rehabilitative alimony in cases that involve long marriages and older parties. *See, e.g.*, *Mark v. Mark*, 2009 UT App 374, ¶ 15, 223 P.3d 476 (concluding that a court abused its discretion by ordering rehabilitative alimony where the parties had been married for twenty-five years and the recipient spouse was fifty-two years old with "limited marketable skills and employment prospects"); *Rasband v. Rasband*, 752 P.2d 1331, 1333–35 (Utah Ct. App. 1988) (concluding that a court abused its discretion by ordering rehabilitative alimony where the parties had been married for thirty years).

¶93    John and Lisa had been married for twenty years and were in their late forties when they divorced. Although Lisa has a bachelor's degree in exercise science and a master's degree in athletic training, she has never worked in those fields. After considering the evidence presented, the trial court ordered John to pay alimony, in the full amount without tapering, for twenty years. John challenges this ruling, asserting that it "requires him to work at a breakneck pace for the rest of his career, while simultaneously relieving Lisa of the obligation to make any progress toward self-sufficiency."

¶94    In this case, the trial court was presented with facts that cut both ways on the rehabilitative alimony question. On the one hand, Lisa is a competent, educated individual with marketable skills, and not so advanced in years that she would be unable to develop a career in a chosen field. But on the other hand, the parties were married for twenty years, Lisa was the primary caregiver for the children and had never worked outside the home, and the parties lived a very comfortable lifestyle based

primarily on John's income; even if Lisa ultimately procures gainful employment outside the home, the income from that job, by itself, is unlikely to be enough to allow her to enjoy anything close to the lifestyle the parties enjoyed during the marriage.

¶95 Under the facts presented here, the trial court did not abuse its discretion in determining not to order rehabilitative alimony, and to order that John pay full alimony for a period of time equal to the length of the marriage. We therefore reject John's challenge to the duration of the trial court's alimony award.

C.     Retroactive Alimony

¶96 The trial court also ordered that its alimony award, although entered in December 2018, be made retroactive for a six-month period dating back to June 1, 2018, the date corresponding to the court's first temporary financial order in the case. John challenges that decision in two respects. He first asserts that the court erred in making its alimony order retroactive "because the parties reached a stipulation regarding temporary orders." Second, he contends that the retroactive award "should be reduced for all the same reasons . . . that the forward-looking alimony award should be reduced." With regard to these challenges, we review the court's decisions for abuse of discretion.

1.   Stipulation

¶97 In divorce, custody, and other domestic cases, the trial court "may order a party to provide money, during the pendency of the action, for the separate support and maintenance of the other party and of any children in the custody of the other party." Utah Code Ann. § 30-3-3(3) (LexisNexis 2019). Such temporary orders "may be amended during the course of the action or in the final order or judgment." *Id.* § 30-3-3(4). Soon after filing her petition for

divorce, Lisa invoked these provisions and asked the court to enter temporary orders of support. Later, in May 2018, the court entered a temporary support order that memorialized a stipulation reached between the parties: Lisa would be able to use a joint credit card for "household expenses," and John would pay those charges (as well as most of the parties' bills), but Lisa would "limit her charges to $3,000 per month," and would "charge no more attorney's or expert fees to the card." The parties followed that procedure for the next few months, up until trial.

¶98    At trial, Lisa testified that the $3,000 monthly allowance turned out to be insufficient to allow her to meet her needs, and that during the temporary orders period she had been forced to "change the lifestyle from what [she] had previously enjoyed during the marriage." She testified that she was unable to attend tennis tournaments with the children or properly care for her horses, that she could not get necessary medical treatment for herself, and that she had to "eat down [her] food storage" and depend on members of her church congregation for "a lot of meals." The trial court credited this testimony, stating during the course of its oral findings that "the temporary orders [had] left [Lisa] almost destitute," and at times dependent on "the bishop's storehouse to put food on the table."

¶99    In its written findings, issued in December 2018, the court found that "retroactive child support and alimony should be awarded from June 1, 2018 to November 30, 2018." In a subsequent order, following post-trial motions, the court calculated the amount of retroactive alimony owed to be $147,000. However, the court "allowed [John] to deduct any amounts he ha[d] paid for bills on [Lisa's] behalf as he was ordered to do in the temporary order," including "the approximately $3,500.00 per month that [Lisa] was able to charge on the joint credit card." The court determined that John had

paid "$80,927.20 . . . on [Lisa's] behalf, so that the final remaining amount of retroactive alimony to be awarded [was] $66,072.80."

¶100 John challenges this aspect of the trial court's alimony award, asserting that, because Lisa stipulated to the temporary orders arrangement, she should not now be heard to complain about its consequences, and that the parties' "stipulation must have an effect." We reject John's argument.

¶101 Trial courts have "significant discretion in fashioning temporary support during the pendency of a divorce action," *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 39, 176 P.3d 476, and, as noted, may at any time amend the orders "during the course of the action *or* in the final order or judgment," Utah Code Ann. § 30-3-3(4) (emphasis added). In practice, temporary orders are often entered after only a brief hearing, where evidence—if taken at all—is taken by proffer, and are intended to be merely a rough-cut estimate of what a court might do after hearing all of the evidence at trial. *Cf. Montano v. Third Dist. Court*, 934 P.2d 1156, 1157–58 (Utah Ct. App. 1997) (per curiam) (acknowledging the parties' representations that "it is a routine practice to issue temporary . . . orders based solely on proffers of witness testimony," and noting that such a practice "is discouraged" in custody proceedings). An arrangement memorialized in a temporary order can of course be changed, in a final decree of divorce, after a court hears all of the evidence during a full trial. *See id.* at 1157. And this is no less true in cases where a court enters a temporary order pursuant to the parties' stipulation. Indeed, a court asked to revisit a temporary orders arrangement after trial might even be justified in applying a higher level of scrutiny to an arrangement reached by stipulation than to one reached after a contested hearing before a commissioner. *Cf. Taylor v. Elison*, 2011 UT App 272, ¶ 14, 263 P.3d 448 (deciding, at least in a custody context, to view

stipulated divorce decrees more skeptically than adjudicated decrees).[10] Although Lisa stipulated to the temporary arrangement whereunder she would be allotted $3,000 for household expenditures, that stipulation did not bar her from testifying, several months later, that the arrangement had proven itself unworkable when viewed against the backdrop of the parties' historical lifestyle. And the stipulation certainly did not prevent the trial court from amending the temporary order retroactively after hearing all of the evidence presented at trial.

¶102 Trial courts have considerable discretion to amend temporary orders at any time during the proceeding; they are certainly justified in doing so in a final judgment entered after a trial in which the parties have had a full and fair opportunity to present evidence. In this situation, the court did not abuse its discretion by making its alimony award retroactive to June 2018, and thereby superseding the apparently unworkable arrangement set forth in the temporary orders. We therefore affirm the court's determination that John should be ordered to pay alimony retroactive to June 2018.[11]

---

10. The case of *Davis v. Davis*, 2001 UT App 225, 29 P.3d 676, cited by John, does not hold to the contrary. In that case, the parties' stipulation was memorialized in a final divorce decree rather than in a temporary order, and concerned an issue of fact: that a father's parental presumption had been rebutted. *Id.* ¶ 10. *Davis* thus has little relevance to the situation presented here, where the stipulation was memorialized in a *temporary* order, and where the matter agreed upon was not a previously disputed fact in issue but, instead, was a temporary agreement about what a workable monthly allowance for Lisa might be.

11. John also argues that the trial court erred by dividing the assets in the parties' joint checking account using a balance from

(continued…)

### 2. Reductions in Retroactive Award

¶103 John's second challenge to the court's retroactive alimony award is his contention that the retroactive award "should be reduced for all the same reasons . . . that the forward-looking alimony award should be reduced."[12] We find merit in this argument. As discussed above, several of the inputs to the court's alimony calculation—regarding some of Lisa's needs, Lisa's earning capacity, and certain aspects of John's income—need to be adjusted. These adjustments will affect not only the prospective amount of alimony owed, but also the court's calculation of how much retroactive alimony John owes. We therefore remand for a recalculation of the retroactive alimony, in light of the adjustments necessary to the overall alimony amount.

---

(…continued)
March 2018 rather than September 2018. However, John acknowledges that, as part of the court's calculation of the retroactive alimony award, he was credited for all funds that Lisa withdrew from that account between April and September 2018. John therefore concedes that if we affirm the retroactive alimony award, then his checking account argument fails. Accordingly, because we affirm the retroactive award, we need not further address this argument.

12. This argument was not presented below, but John asserts that it "does not need to be preserved because it was raised for the first time in the trial court's decision." (Citing *State ex. rel. D.B.*, 2012 UT 65, ¶ 34, 289 P.3d 459.) This does appear to be such a situation where "the general preservation rule does not apply" because "the alleged error first arises in the lower court's final order or judgment and thus, leaves no opportunity for the party to object below or to bring issues to the attention of the trial court." *See id.* (quotation simplified).

## II. Attorney Fees

¶104   With regard to attorney fees, the court ruled that, "[b]ased on [its] rulings [regarding] division of property and debts . . . , the Court is not awarding either party his/her attorney's fees—in that both parties will have sufficient assets and/or income to pay their attorney's fees." John challenges this ruling, asserting that, although the court nominally ordered each party to bear his or her own fees, the practical effect of its ruling was that "John paid both parties' fees." This claim was preserved, so we review for abuse of discretion.

¶105   Prior to entry of the temporary orders, Lisa had charged nearly $80,000—and John charged nearly $40,000—in attorney and expert fees to the parties' joint credit card, which caused the card account to "reach[] its credit limit" because John "had been unable to pay down the balance while continuing to meet the parties' other obligations." John ultimately borrowed $50,000 against his 401(k) to help pay off the balance. Due in part to this development, the parties agreed to include in the temporary order a provision barring Lisa from charging any more attorney and expert fees to the joint credit card, and Lisa charged no additional fees to the card after that. After trial, the court ordered each party to pay his or her own attorney and expert fees, and made no adjustment to account for the portion of Lisa's attorney fees that John had already paid.

¶106   John brought this issue to the court's attention in a post-trial motion, asserting that, in essence, he had paid a substantial portion of Lisa's attorney fees without being credited for it, and because the court had "ordered that each party should pay his or her own attorney's fees," "[a]n adjustment [was] needed . . . in order to make that happen." As a result, John asked the court to treat the payments "as premature distributions of the marital estate" when formulating its retroactive alimony determination. Lisa opposed this, arguing that John was "attempting to 'double

count' many of the same funds" by asking for the 401(k) loan to be included in the marital debt calculation, while also asking for attorney fees he paid in the past to be assigned to Lisa."

¶107   Ultimately, the court sided with Lisa: it refused to change its prior ruling regarding attorney fees, and declined John's invitation to adjust the retroactive alimony amount to account for fees he had already paid. In its oral ruling, the court stated simply that it was "not going to change" its prior ruling, that it "[did not] care if [payments were made] during that retroactive time," and that it was "not going to" give John credit for his payment of some of Lisa's fees. In its written order, the court devoted one sentence to the issue, stating simply that it was "declin[ing] to equalize the parties' use of marital funds for payment of attorney's fees prior to trial," and that it "denie[d] [John's] motion on this point."

¶108   "In divorce cases, both the decision to award attorney fees and the amount of such fees are within the trial court's sound discretion." *Roberts v. Roberts*, 2014 UT App 211, ¶ 27, 335 P.3d 378 (quotation simplified). "Attorney fee awards, however, must be based on [i] evidence of the financial need of the receiving spouse, [ii] the ability of the other spouse to pay, and [iii] the reasonableness of the requested fees. And, failure to consider these factors is grounds for reversal on the fee issue." *Id.* (quotation simplified). In *Roberts*, we "conclude[d] that the [trial] court did not adequately explain" its attorney fees award decision because, although it did make a finding about the amount of fees, the trial court "did not make any specific findings on the reasonableness of the award, [the husband's] ability to pay, or [the wife's] needs." *Id.* ¶¶ 28–29.

¶109   In this case, it was within the court's discretion to make attorney fees awards to one party or another. But in order to do so, the court must first make adequate findings. *See id.* ¶¶ 27–29. Here, the court professed not to be making any award of

attorney fees, and to be requiring each party to bear his or her own, but John has persuasively argued that he paid a significant part of Lisa's fees without being credited for that payment. If the court wishes to award Lisa those fees, and require John to pay them, it must engage with the three-part test, and make the required findings. It cannot make such an award sub silentio, while asserting that its order asks both parties to bear their own fees.

¶110   We therefore remand this issue to the trial court for it to clarify which path it is taking. It has two options. It can continue to insist that both parties bear their own fees, in which case it needs to make an adjustment to account for any portion of Lisa's fees that John paid, or at least explain why no such adjustment is necessary. Alternatively, it can explicitly make a partial award of attorney fees to Lisa, in which case it needs to make appropriate findings, as set forth in *Roberts*.

CONCLUSION

¶111 We affirm many aspects of the trial court's alimony award. In particular, we affirm the court's decisions to award alimony for twenty years and to award retroactive alimony. We also reject John's argument that, with respect to his future income, the court's alimony award is inconsistent with its custody award. However, we have identified a number of errors in the court's computation of the amount of alimony, and we have identified a potential inconsistency in the court's handling of the attorney fees issue. Accordingly, we reverse those aspects of the court's rulings, and remand for further proceedings consistent with this opinion.

————————