2017 UT App 24

# THE UTAH COURT OF APPEALS

GREG J. POPE,
Appellant,
*v.*
CARMEN R. POPE,
Appellee.

Memorandum Decision
No. 20150869-CA
Filed February 9, 2017

Third District Court, Salt Lake Department
The Honorable Barry G. Lawrence
No. 134904171

Marshall Thompson and Emily Adams, Attorneys
for Appellant

Russell Yauney, Attorney for Appellee

JUDGE STEPHEN L. ROTH authored this Memorandum Decision, in
which JUDGES MICHELE M. CHRISTIANSEN and KATE A. TOOMEY
concurred.

ROTH, Judge:

¶1    Greg J. Pope (Father) appeals from the district court's
memorandum decision and decree of divorce, particularly the
court's custody determination. We affirm.

¶2    Father and Carmen R. Pope (Mother) wed in 2009. In 2013
they filed for divorce. The parties have two children and shared
joint legal and physical custody of the children following their
separation. In a three day bench trial, the parties contested,
among other things, which parent should be the children's
primary custodian and which school the children should attend.

¶3   Following trial, the district court entered a detailed and thorough memorandum decision in which it made findings of fact and conclusions of law regarding custody of the children. The court ultimately determined that the parties should have joint legal and physical custody of the children, but that Mother should be the children's primary custodian and that the children should attend school in Mother's neighborhood. Father challenged the court's ruling in a post-trial motion to amend and enter new judgment. Specifically, Father contested the court's findings regarding several custody factors—moral character and emotional stability, ability to provide personal rather than surrogate care, and financial condition—and its determination that the children should attend school in Mother's neighborhood. He also challenged the district court's decision to permit Mother's fiancé to testify at trial despite the fact that the fiancé, who was not expected to testify, had remained in the courtroom after the witness exclusion rule was invoked. *See generally* Utah R. Evid. 615 ("At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony."). The district court denied Father's motion in a written decision in which the court further explained its reasoning.

¶4   On appeal, Father raises the same challenges to the district court's findings that were addressed in his post-trial motion. "We will not disturb a trial court's findings of fact unless they are clearly erroneous, that is, unless they are in conflict with the clear weight of the evidence, or this court has a definite and firm conviction that a mistake has been made." *Robertson v. Robertson*, 2016 UT App 55, ¶ 5, 370 P.3d 569 (ellipsis, citation, and internal quotation marks omitted). And we afford "a trial court . . . considerable 'discretion to decide whether a defendant will be prejudiced by permitting a witness to testify in the face of a violation of the [witness exclusion] rule.'" *See State v. Gibson*, 2016 UT App 15, ¶ 13, 366 P.3d 876 (alteration in original) (quoting *State v. Carlson*, 635 P.2d 72, 74 (Utah 1981)).

¶5    Father first asserts that the district court's determination that the moral character and emotional stability factors weighed in favor of Mother was contrary to the evidence. He specifically takes issue with the court's finding that Father's "categorical denials" of alleged online misconduct called into "question his veracity and honesty." At trial, Mother testified that, toward the end of the marriage, she found text messages and emails on Father's phone and computer from people responding to a classified ad Father had posted online. According to Mother, some of these emails indicated that Father was engaged in illegal activity, while others suggested simply personal relationships. Mother further testified that, when she confronted Father with the emails, he admitted to illegal conduct. Mother also testified that she found nude photos of Father and other individuals on a thumb drive belonging to Father. She also testified, however, that both the thumb drive and the emails were either lost or destroyed. While Father admitted to having viewed pornography, he denied having posted online ads "to try to find people to meet up with" or "to try to engage in any sort of sexual activity with anybody." He also denied having sent any messages arranging "to meet up with people," or ever possessing a thumb drive with nude photos of himself and others on it. Lastly, Father denied that Mother ever confronted him about messages or photos and claimed that the first time he had ever heard any such allegations was in court.

¶6    The district court made the following findings about Father's online activities:

> While the Court found [Mother] to be credible regarding some of those events—i.e., online dating and involvement with pornography—it was speculative that [Father's] conduct was criminal as opposed to distasteful. And, there was nothing indicating that the Minor Children's well-being or safety was ever at risk as a result of [Father's]

alleged activities, whatever they may have been . . . . Finally, although there was nothing solidly linking [Father] to defined criminal behavior, the Court did find [Mother] to be a credible witness. Thus, [Father's] categorical denials of the alleged conduct causes the Court to question his veracity and honesty.

Father maintains that the court could not have simultaneously determined both that Mother was credible and that he had not engaged in criminal conduct. He likewise asserts that the court could not have found his denials to be dishonest when the court itself determined that the evidence was insufficient to demonstrate that he engaged in any illegality. Thus, Father argues that the district court's determination that the moral character and emotional stability factors weighed in favor of Mother was clearly erroneous.

¶7     We cannot agree with Father's assertion that the district court's findings regarding the illegal activity allegations were internally inconsistent.

> Trial courts are accorded wide latitude in determining factual matters. They are in the best position to assess the credibility of the witnesses and to gain a sense of the proceeding as a whole. Where contradictory testimony is offered by two witnesses, the fact finder is free to weigh the conflicting evidence presented and to draw its own conclusions.

*Valcarce v. Fitzgerald*, 961 P.2d 305, 314 (Utah 1998) (plurality opinion) (alteration, citations, and internal quotation marks omitted). A careful reading of the findings indicates that the court believed Mother's account that Father was involved in meeting for romantic liaisons with people he met through the internet—what the court referred to as "online dating."

However, the court believed the evidence was "speculative" as to whether Father's "conduct was criminal as opposed to distasteful." In light of Mother's testimony, it was not clearly erroneous for the district court to conclude that Father was engaged in some form of romantic contact with individuals he met online and that Father's categorical denials of such activity were disingenuous, while not going so far as to conclude that Father engaged in anything unlawful.

¶8 In any event, it is apparent that Father's alleged activities did little to influence the district court's ultimate determination that the moral character and emotional stability factors favored Mother. Indeed, the court acknowledged that Mother had likewise engaged in "questionable conduct" online and concluded that, whatever the nature of Father's behavior had been, there "was nothing indicating that the Minor Children's well-being or safety was ever at risk" because of it. Thus, the court did not appear to demonstrate a preference for either parent based on their respective online dating behavior. Rather, the court explained that the primary factor contributing to its decision on this issue was that Father had taken his two-year-old son with him during a criminal episode in Maryland in which he attempted to extort money from another individual, and Father's resulting felony conviction.

¶9 In its findings, the court explained that Father showed a "lack of judgment" by "having his child present during the events of that crime," that Father did not "convince the Court that he appreciated the gravity of his past actions," and that the court consequently had "reservations regarding [Father's] ability to make sound decisions in the best interests of the Minor Children." Further, in ruling on Father's post-trial motion, the district court confirmed that it "did not base its ruling on [the illegal activity] allegation," but rather it "considered all evidence," most notably the "criminal episode in Maryland." Father does not challenge the court's findings regarding that

incident. Thus, the district court's conclusion that the moral character and emotional stability factors favored Mother was based on a well-reasoned and considered assessment of the credibility of the parties and the weight of the evidence presented on both sides, in which we find no error.

¶10    Father next challenges the district court's finding that the parties were equally capable of providing personal rather than surrogate care. The court found that Father was working part time on the night shift as a janitor and therefore "ha[d] his weekdays available to take care of the Minor Children." However, the court was skeptical that Father could maintain such a work schedule long term because he was underemployed and "fore[went] child care while he [was] at work" to save money. The court likewise found Mother's aspiration to be a stay-at-home mother to be economically unreasonable, even after her upcoming remarriage. While the district court recognized that Father was then in the best position to provide personal care because he was working part time at night, it concluded that, in the long term, "the most likely scenario is that both parties will need to be gainfully employed on a full-time basis to adequately provide for the needs of themselves and the Minor Children as they mature."

¶11    In challenging the court's conclusion that the personal care factor was neutral, Father focuses primarily on the court's expression of concern that "the young children [were] left unattended during the evening hours" while Father was at work. Father lived in a basement apartment in his mother's (Grandmother's) home. He put the children to bed before he left for work. There was an external entrance to the apartment, but it was locked while Father was gone. Although the children slept alone in the basement, there was an internal staircase from which they could access the main floor, and Grandmother testified that she could hear the children and attend to their needs if concerns arose. Thus, Father asserts that the district

court clearly erred in finding that the children were left unattended during the evening hours.

¶12 Although the court suggested that the children were left "unattended" while Father was at work, it clearly recognized and considered the fact that Grandmother was present in the home. Nevertheless, the court was "not convinced that in the event of emergency the Minor Children would be timely and adequately protected and cared for." We are not persuaded that such a finding was clearly erroneous in light of the evidence. While Father asserts that the court's ruling essentially concludes that "anyone caring for minor children must sleep on the same level of the house as the children," the fact that the basement was delineated as a separate living space, both physically and in the children's minds, albeit with ready access via an internal staircase, makes this situation somewhat different from that of a typical dedicated caregiver sleeping on a separate level of a single-family home. As the court observed in its ruling on the post-trial motion, Father "made it a point during his testimony, that although he resided in the basement of his mother's home, it was in a separate 1300 square foot, two-bedroom apartment, with a separate entrance." Grandmother similarly testified that although the children were welcome in her part of the house, she and Father "encourage[d] the children to . . . own their space and use their door to the outside" and, further, that the children understood that "dad's house" and "grandma's house" were separate.

¶13 Given these circumstances, the court's skepticism about whether the children had adequate care during the night was not clearly erroneous. This is especially so as the court's concern was expressed in the context of comparing Mother's and Father's households and their long-term financial conditions and did not amount to an affirmative finding that the children would be at serious risk with Father. Indeed, the court concluded that the

relative ability of the parties to provide personal versus surrogate care favored Father in the short term.

¶14   Further, the court's determination that Father's employment situation was unsustainable relied not only on his inability to afford adequate child care when he was at work, but also on the fact that Father had to live with Grandmother in order to "accommodate his part-time earnings." Although Father maintains that he could continue working part time and living with Grandmother indefinitely, Grandmother herself testified that she did not anticipate Father and the children living in her basement long term. She stated that although she had no deadline for Father and the children to move out of her home, she hoped that Father would become "self-sustaining at some point[,]" and she and Father had talked about Father getting "his own place" "somewhere in the near future." Thus, even setting aside the question of whether the children were adequately cared for at night when Father was working, the court did not exceed its discretion in determining that Father's part-time employment and living situation were unsustainable and that he would eventually need to seek full-time employment that would limit his ability to provide personal care for the children. Accordingly, we conclude that there was an adequate basis in the evidence to support the court's determination that the surrogate care factor currently favored Father because of his availability due to part-time work but would be neutral in the long run because of the instability of his financial situation. *See In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435 ("When a foundation for the court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence.").

¶15   Father also challenges the basis for the district court's related conclusion that the parties' relative financial conditions favored Mother. Father argues that the district court inappropriately favored Mother's "step-parent household" over Father's "multigenerational household" by taking into account

the income of Mother's fiancé when analyzing her financial circumstances but refusing to "also consider Grandmother's income in Father's favor." While Grandmother was effectively subsidizing Father's living expenses by letting him live in her basement for only $200 per month, she indicated that she expected Father to move out "in the near future." As the district court observed in its ruling on the post-trial motion, "neither [Father] nor [Grandmother] presented evidence that [Grandmother] contributed financially to the care/support of the Minor Children." (Footnote omitted.) Thus, the court did not err in failing to consider Grandmother's income in analyzing Father's financial situation because there was no basis for the court to conclude that Grandmother planned to make long-term financial contributions to the children's care as Mother's fiancé planned to do.

¶16　Father next challenges the district court's ruling that the children should change schools and attend school in Mother's neighborhood. His argument rests on the assertion that the district court relied primarily on published school quality rankings to determine which school the children should attend rather than considering the emotional impact a change in schools would have on the children. Evidence presented at trial indicated that the children were doing well at their current school, and Father testified that he wanted the children to "continue[] going to the school that they've been accustomed to and are doing wonderfully at" and that he thought it was important for them to attend a school that is ethnically diverse. But Father did not specifically argue at trial that the children would be emotionally harmed by changing schools. His arguments in the post-trial motion and on appeal rest on his statement that "[o]ne of the most traumatic things that can happen to a young child is to change schools." Beyond this bare assertion, however, Father has never attempted to present even general evidence that the effects of changing schools are deep and permanent, let alone specific evidence that his children in

particular would suffer as a result of a move. Having been presented with no evidence on point, we are unpersuaded by Father's assertion that the district court should have done more to consider the emotional impact that changing schools would have on the children. *See State v. Guard*, 2015 UT 96, ¶ 29, 371 P.3d 1 (indicating that an issue "must be supported by evidence and relevant legal authority" (citation and internal quotation marks omitted)).

¶17 Further, while we acknowledge that a change in schools can be difficult for a child, the transitory distress from such a move does not as a matter of law necessarily outweigh other factors that might impact that child's well-being. Here, the district court found that the school in Father's neighborhood was ranked 525th out of 561 elementary schools in the state, while the school in Mother's neighborhood was ranked 78th. The school in Father's neighborhood had standardized test scores of 52.53 in language arts and 59.25 in math, whereas the school in Mother's neighborhood scored 86.30 in language arts and 88.17 in math. Given the significant discrepancy between the academic performance of the two schools, it was within the court's discretion to determine that, under the particular circumstances, the educational opportunities afforded by the school in Mother's neighborhood outweighed the benefits of ethnic diversity at the school in Father's neighborhood, as well as any concerns about how the children would adjust to a change in schools.[1]

¶18 Finally, Father argues that the court exceeded its discretion in permitting Mother's fiancé to testify despite his having remained in the courtroom after the witness exclusion

---

1. This is especially true where the instability of Father's living situation introduced some uncertainty about whether the children would be able to continue attending their current school.

rule was invoked. Although the fiancé was on the original witness list, Mother's counsel did not intend to call him as a witness, which is why he was not excluded from the courtroom when the rule was invoked. Rather, Mother's fiancé testified at the district court's own request. After hearing the evidence presented by the parties, some of which focused on the role of the fiancé in the children's lives, both present and prospective, the judge stated, "I think I need to hear from him."

¶19   "[A] trial court retains considerable 'discretion to decide whether a [party] will be prejudiced by permitting a witness to testify in the face of a violation of the [witness exclusion] rule.'" *State v. Gibson*, 2016 UT App 15, ¶ 13, 366 P.3d 876 (first and second alterations in original) (quoting *State v. Carlson*, 635 P.2d 72, 74 (Utah 1981)). "The purpose of the [witness exclusion] rule is to prevent witnesses from being influenced or tainted by the testimony of other witnesses, or other evidence adduced at trial." *State v. Curtis*, 2013 UT App 287, ¶ 22, 317 P.3d 968 (citations and internal quotation marks omitted). Thus, "to show that a trial court abused its discretion in allowing a witness to testify despite a violation of the exclusionary rule, the [objecting party] carries 'the onus of showing' prejudice," *Gibson*, 2016 UT App 15, ¶ 13 (quoting *Carlson*, 635 P.2d at 74), "and, in particular, must demonstrate that the witness 'changed [his or her] testimony' in some material way because of what [he or she] heard," *id.* (quoting *State v. McGrath*, 749 P.2d 631, 634 (Utah 1988)). In addition, "rulings on evidence are looked upon with a greater degree of indulgence when the trial is to the court than when it is to the jury" "because it can be safely assumed that the trial court will be somewhat more discriminating in appraising both the competency and the rulings properly to be given evidence." *State v. Park*, 404 P.2d 677, 679 (Utah 1965). Given the deference we grant and the fact that Father has failed to present evidence suggesting that Mother's fiancé altered his testimony based on what he heard in the trial, we are not persuaded that

the fiancé's testimony resulted in unfair prejudice or that the court exceeded its discretion in permitting the testimony.

¶20   We reject Father's challenges to the district court's findings on the various custody factors. The district court's detailed findings of fact were not clearly erroneous and were sufficient to support its determination that granting primary custody to Mother and ordering the children to change schools was in the children's best interests. Further, because Father has failed to show that he was unfairly prejudiced by the testimony of Mother's fiancé, the court did not exceed its discretion in permitting the testimony.

¶21   Affirmed.

————