2022 UT App 88

# THE UTAH COURT OF APPEALS

DiAnn Sheri Fox,
Appellant,
*v.*
Benjamin Davis Fox,
Appellee.

Opinion
No. 20200949-CA
Filed July 14, 2022

Fifth District Court, St. George Department
The Honorable Matthew L. Bell
No. 184500543

Lincoln Harris and Kari N. Dickinson,
Attorneys for Appellant

N. Adam Caldwell and Chantelle M. Petersen,
Attorneys for Appellee

Judge Ryan M. Harris authored this Opinion, in which Judge Gregory K. Orme and Justice Diana Hagen concurred.[1]

HARRIS, Judge:

¶1 DiAnn Sheri Fox appeals several aspects of a comprehensive set of rulings issued by the trial court following a two-day divorce trial, including various findings relating to the court's alimony award, its division of marital debts, and its determination that her ex-husband, Benjamin Davis Fox, was not

---

1. Justice Diana Hagen began her work on this case as a member of the Utah Court of Appeals. She became a member of the Utah Supreme Court thereafter and completed her work on the case sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 3-108(4).

voluntarily underemployed. For the reasons discussed below, we affirm the court's orders.

## BACKGROUND

¶2      DiAnn and Ben[2] were married in 1997, while Ben was in college and about to start medical school. After completing his training, Ben became a successful neurosurgeon with his practice centered in St. George, Utah. In the marriage's final years, Ben was making more than $1 million per year, with his monthly pay sometimes as high as $110,000. Ben and DiAnn have six children together, four of whom were minors at the time of trial.

¶3      In keeping with Ben's impressive income, the parties lived a lavish lifestyle during the marriage. To support that lifestyle, Ben spent a significant amount of time at work—as much as 80 to 100 hours per week. And even when he was not working, Ben was often "on call," meaning that he had to stay within fifteen minutes of the hospital in case of a medical emergency. Ben took more "on call" shifts than any other physician in his practice. Part of the reason Ben worked such a taxing schedule—even for a neurosurgeon—was because he was qualified as both a neurosurgeon and as a neurointerventionalist, and his services were often in demand. Ben testified that, as a result, he was becoming burnt out and "physically and emotionally exhausted," and that his work schedule was not sustainable. Due to his schedule, Ben spent comparatively little time with the children, leaving DiAnn largely responsible for their day-to-day care.

¶4      DiAnn has a bachelor's degree in elementary education and worked full-time as a teacher before the couple's children

---

2. Because the parties share the same surname, we follow our usual practice of referring to them by their first names, with no disrespect intended by the apparent informality.

were born. While Ben was still in medical school, however, Ben and DiAnn decided that DiAnn would not generally work outside the home but instead would care for their children full-time. At the time of trial, DiAnn was working part-time for the local school district, earning ten dollars per hour.

¶5     In 2018, DiAnn filed for divorce. As part of her petition, DiAnn sought primary physical custody of the children, child support, alimony, equitable division of the marital debts, and equitable division of the marital property. A few months later, the trial court entered a temporary order awarding DiAnn primary physical custody of the children, with Ben allowed parent-time pursuant to Utah Code section 30-3-35.1. The court ordered Ben to pay $12,313 per month in child support, and $21,030 per month in alimony. The parties were also ordered to continue paying $2,500 ($1,250 each) per month to DiAnn's father, to whom they owed a significant amount of debt.

¶6     After DiAnn filed for divorce, but prior to trial, Ben relocated to Florida and accepted employment there as a neurosurgeon. In his new position, Ben was paid less than he had been paid in St. George: instead of earning as much as $110,000 per month, Ben was now earning some $80,000 per month (nearly $1 million annually) in gross income. But in Florida, Ben had a less hectic work schedule, typically working 50 to 60 hours per week as opposed to the 80 to 100 hours per week he had often been working in St. George.

¶7     Also prior to trial, DiAnn filed a financial declaration with the trial court. In that declaration, she claimed $32,577.24 in monthly expenses, including—among other things—$16,132.24 for the mortgage payments on the parties' large house; $1,880 for maintenance on the house; $2,000 for food and household supplies; $2,400 for utilities; $1,250 for half of the loan payments to her father; $855 for the children's extracurricular activities; and

$577.24 for travel, which included the costs associated with a timeshare condominium the couple owned in Hawaii.

¶8    Soon thereafter, the case proceeded to a bench trial, which was held over two days in September 2020. During the trial, the court heard testimony from DiAnn and Ben, as well as several other witnesses. DiAnn asked the court to find that Ben was voluntarily underemployed—because he was earning less in Florida than he had in St. George—and additionally asked that Ben's higher St. George salary be imputed to him for the purposes of child support and alimony. In light of this request, and based on her expert's testimony that the parties had established a standard of spending some $70,000 per month during the marriage, DiAnn asked the court to award her $11,050 per month in child support and some $35,000 per month in alimony.

¶9    In response to DiAnn's argument that he was voluntarily underemployed, Ben called an expert to testify that, even with his reduced income, Ben's earnings were above the 90th percentile of income for neurosurgeons in the United States. Ben thus requested that alimony and child support be calculated based on his Florida income and that the court reject DiAnn's assertion that he was voluntarily underemployed.

¶10    We will discuss some of the particulars of the court's ruling in more detail below, on an issue-by-issue basis. But in broad strokes, the court ruled in relevant part as follows: (a) the parties were awarded joint legal custody of the children; (b) DiAnn was awarded primary physical custody; (c) Ben was allowed parent-time pursuant to Utah Code section 30-3-37; (d) Ben's monthly income would be calculated based on his Florida income, not his St. George income; (e) DiAnn's net income was initially set at $699 per month, but would increase to $2,915 per month after two years; (f) Ben was not voluntarily underemployed; (g) Ben was ordered to pay DiAnn $9,760 per month in child support, which would decrease as the children transitioned into adulthood;

(h) Ben was ordered to pay DiAnn $15,039 per month in alimony for a period of two years, and then $12,995 per month for another 22 years, unless terminated earlier "upon the death of either party, the remarriage or cohabitation of [DiAnn], or for any other reason under Utah law"; and (i) DiAnn was assigned sole responsibility for the marital debt owed to her father.

## ISSUES AND STANDARDS OF REVIEW

¶11 DiAnn now appeals various aspects of the trial court's rulings, and presents three principal issues for our review.[3] First, she challenges various aspects of the court's alimony award. We review a court's "alimony determination for an abuse of discretion and will not disturb its ruling on alimony as long as the court exercises its discretion within the bounds and under the standards our supreme court has set and so long as the trial court

---

3. In her initial brief, DiAnn presented an additional issue: whether the trial court erred when it ordered the parties to equally share the costs associated with a court-ordered parenting coordinator and parenting camp without DiAnn being awarded any funds to pay for those services. We need not reach this issue, however, because it has been rendered moot. *See State v. Legg*, 2018 UT 12, ¶ 13, 417 P.3d 592 ("We generally won't decide an issue that becomes moot while on appeal."). In its order, the trial court mandated that the parties retain a parent coordinator "within sixty (60) days of the entry of [the] decree" and that "the parties and minor children attend an 'overcoming barriers camp' (or a similar camp) provided such a camp is reasonably available within one year of entry of the decree." But DiAnn herself acknowledged, at oral argument before this court, that the time constraints on these two mandates had passed without any money being expended on either a parenting coordinator or a parenting camp. She thus conceded that this issue is now moot. We agree, and therefore do not address this issue further.

has supported its decision with adequate findings and conclusions." *Miner v. Miner*, 2021 UT App 77, ¶ 11, 496 P.3d 242 (quotation simplified).

¶12 Second, DiAnn argues that the court abused its discretion when it assigned her the sole responsibility for the parties' debt owed to her father and included the full payment for that debt in its alimony calculation. "The trial court's division of debts is reviewed for abuse of discretion." *Boggess v. Boggess*, 2011 UT App 84, ¶ 2, 250 P.3d 86 (per curiam). And because trial courts are in the "best position to weigh the evidence, determine credibility and arrive at factual conclusions, they have considerable latitude" to equitably divide marital debt "and their actions are entitled to a presumption of validity." *Mullins v. Mullins*, 2016 UT App 77, ¶ 20, 370 P.3d 1283 (quotation simplified). "Accordingly, it would be inappropriate for an appellate court to reverse on an isolated item of property or debt distribution." *Id.* (quotation simplified). "Rather, we must examine the entire distribution to determine if the trial court abused its discretion." *Id.* (quotation simplified).

¶13 And finally, DiAnn asserts that the court erred when it found that Ben was not voluntarily underemployed. We "review the trial court's finding of voluntary unemployment or underemployment and its calculation of imputed income for an abuse of discretion." *Christensen v. Christensen*, 2017 UT App 120, ¶ 10, 400 P.3d 1219. "We will not disturb a trial court's findings of fact unless they are clearly erroneous, that is, unless they are in conflict with the clear weight of the evidence, or this court has a definite and firm conviction that a mistake has been made." *Pope v. Pope*, 2017 UT App 24, ¶ 4, 392 P.3d 886 (quotation simplified).

## ANALYSIS

¶14 We begin with DiAnn's challenge to the trial court's alimony award, analyzing each aspect of that challenge in turn.

We then turn to DiAnn's assertion that the court abused its discretion in assigning her the marital debt owed to her father. We conclude by examining DiAnn's challenge to the court's finding that Ben was not voluntarily underemployed.

## I. Alimony

¶15    "Under Utah law, the primary purposes of alimony are: (1) to get the parties as close as possible to the same standard of living that existed during the marriage; (2) to equalize the standards of living of each party; and (3) to prevent the recipient spouse from becoming a public charge." *Miner v. Miner*, 2021 UT App 77, ¶ 14, 496 P.3d 242 (quotation simplified). "Alimony is not limited to providing for only basic needs but should be fashioned in consideration of the recipient spouse's station in life in light of the parties' customary or proper status or circumstances, with the goal being an alimony award calculated to approximate the parties' standard of living during the marriage as closely as possible." *Id.* (quotation simplified).

¶16    During their marriage, DiAnn and Ben enjoyed a high standard of living, and in an attempt to approximate that standard of living, the trial court ordered Ben to pay DiAnn more than $15,000 per month in alimony for two years, and nearly $13,000 per month for 22 years thereafter. DiAnn takes issue with this alimony award.

¶17    But in so doing, DiAnn does not challenge the court's decision about the duration or future reduction of the award, nor does she take issue with any of the specific line-item calculations the court made in arriving at the total alimony amount. Instead, DiAnn advances two other arguments. First, she asserts that the court erred by not starting its analysis by making a separate finding regarding the parties' "marital standard of living," and by not taking that standard of living sufficiently into account. Second, DiAnn argues that the court abused its discretion when it

included the children's extracurricular activity expenses in its alimony calculation, and then ordered that DiAnn be responsible for those expenses. We address each of these arguments, in turn.

A.     Marital Standard of Living

¶18    DiAnn's first challenge is an assertion that the trial court failed to properly take into account the parties' marital standard of living. Specifically, relying on *Rule v. Rule*, 2017 UT App 137, 402 P.3d 153, DiAnn argues that the court failed to start its alimony analysis by making a separate finding specifically calculating the overall marital standard of living, and asserts that the court erroneously "moved straight to an arbitrary needs-based alimony analysis." This, DiAnn asserts, contradicts the "roadmap" set out in *Rule*. In particular, DiAnn points to her own expert's analysis—that the parties were spending, on average, more than $70,000 per month during the marriage—and asserts that the court should have concluded that she is entitled to half that amount in alimony, at least as long as Ben is able to pay it.

¶19    DiAnn misreads *Rule*. To be sure, in that case we noted that one of the purposes of alimony is "to get the parties as close as possible to the same standard of living that existed during the marriage," and we categorized it as "inherently problematic for a trial court to attempt to design an alimony award that advances the overall goal of allowing the parties to go forward with their lives as nearly as possible at the standard of living enjoyed during marriage without first determining what that standard was in the first instance." *See id.* ¶¶ 14, 18 (quotations simplified). But we clarified that a court appropriately takes that standard of living into account by "assess[ing] the needs of the parties, in light of their marital standard of living." *Id.* ¶ 19 (quotation simplified); *see also id.* ¶ 15 (noting that trial courts are required "to determine the parties' needs and expenses . . . in light of the marital standard of living"). The ceiling on a recipient spouse's alimony award is represented by that spouse's needs, viewed in light of the marital

standard of living. *See id.* ¶ 17 ("The receiving spouse's needs ultimately set the bounds for the maximum permissible alimony award."); *see also Vanderzon v. Vanderzon*, 2017 UT App 150, ¶ 61, 402 P.3d 219 (stating that "in no case may the trial court award [the recipient spouse] more alimony than [his or] her demonstrated need"); *Jensen v. Jensen*, 2008 UT App 392, ¶ 13, 197 P.3d 117 (stating that, "regardless of the payor spouse's ability to pay more, the recipient spouse's demonstrated need must constitute the maximum permissible alimony award" (quotation simplified)). There is usually no need for a trial court to make a separate specific finding regarding the overall "marital standard of living" as measured by the total amount of money spent each month by the couple while they were married, and we did not intend to imply otherwise in *Rule*.

¶20    Indeed, in that case we made clear that we were not prescribing any deviation from the "established . . . process to be followed by courts considering an award of alimony." *See Rule*, 2017 UT App 137, ¶ 19; *see also id.* ¶ 13 (citing the statute now codified at Utah Code section 30-3-5(10)(a), and stating that "courts must consider the statutory" alimony factors, which are "the financial condition and needs of the recipient spouse," "the recipient's earning capacity," and "the ability of the payor spouse to provide support" (quotation simplified)). The first step in that process is for the court to "assess the needs of the parties, in light of their marital standard of living." *Id.* ¶ 19 (quotation simplified). "This means that the court must determine the parties' needs reasonably incurred, calculated upon the standard of living enjoyed during the marriage." *Id.* (quotation simplified). In the next step, the court must "determine the extent to which the receiving spouse is able to meet [his or] her own needs with [his or] her own income," and if the receiving spouse "is able to meet all [his or] her needs with [his or] her own income, then [the court] should not award alimony." *Id.* (quotation simplified). Finally, and only if the court determines that the recipient spouse cannot

meet his or her own needs, the final step in the process is for the court to "assess whether the payor spouse's income, after meeting his [or her] needs, is sufficient to make up some or all of the shortfall between the receiving spouse's needs and income." *Id.* ¶ 20 (quotation simplified).

¶21 The trial court followed this three-step process in this case. It made twenty-three separate line-item findings regarding DiAnn's reasonable monthly expenses, using her requested amounts as a starting point, and it adjusted four of the line items downward and three of them upward. The court determined that DiAnn's reasonable monthly needs, as adjusted, amounted to $25,424.61. And on appeal, DiAnn does not take issue with any of the twenty-three specific line-item findings. That is, she does not assert that any of those particular findings—for instance, her housing expenses, or her automobile expenses—are not in harmony with the marital standard of living.

¶22 The court also made findings regarding DiAnn's ability to earn income, and determined that her net income (after taxes) was $699 per month for the first two years, and then would be adjusted to $2,915 per month. The court then subtracted her income and the child support payments from her needs, and determined that DiAnn would have a monthly shortfall of $15,039 per month for the first two years, which would narrow to $12,995 per month after that. On appeal, DiAnn does not specifically challenge these calculations, including the court's findings regarding her ability to earn income.

¶23 Finally, the court assessed whether Ben had the ability to pay DiAnn's demonstrated shortfall, and determined that he did, even using Ben's Florida income rather than his St. George income, and even after paying child support and meeting his own reasonable monthly needs. DiAnn's only complaint about this analysis is that the trial court erred by using Ben's Florida income for the basis of its computation, as opposed to his St. George

income. But DiAnn of course does not quibble with the court's ultimate conclusion that Ben can meet every dollar of her demonstrated shortfall.

¶24 We perceive no error in the procedure the trial court employed in computing DiAnn's alimony award. As noted, the court appropriately went through the three-step process required by applicable law. If DiAnn believed that the court inappropriately assessed any of her individual expenses, as measured in light of the marital standard of living, she had every opportunity to challenge any of the specific line-item calculations the court relied on in determining her monthly needs. *See Miner*, 2021 UT App 77, ¶¶ 20–63 (evaluating an appellant's challenges to eleven separate line items in a trial court's calculation of a recipient spouse's needs). But she does not challenge any of them.

¶25 DiAnn has therefore not carried her appellate burden of demonstrating that the trial court failed to appropriately take into account the marital standard of living in calculating her needs. In this case, the court was not required to make any specific finding regarding how much total money the parties spent each month during the marriage, and it was certainly not required to presumptively award DiAnn half of any such amount as alimony. In short, we perceive no abuse of discretion in the manner in which the court assessed DiAnn's needs or in which it took into account the parties' marital standard of living, and on that basis we reject DiAnn's first challenge to the alimony award.

B.    Extracurricular Activities

¶26 DiAnn next contends that the court abused its discretion when it included the minor children's extracurricular activity expenses in its alimony award to DiAnn. Specifically, she argues that the extracurricular expenses should have been included in an increased child support award instead of the alimony award or,

alternatively, that the court should have "issued a separate award equitably dividing the expenses." We disagree.

¶27    Presumptive monthly child support payment amounts are set by statutory schedule, depending on the incomes of the parents and the precise custody arrangement between them. *See* Utah Code Ann. §§ 78B-12-205, -212, -301 (LexisNexis 2018). These presumptive monthly payments are designed to include nearly all reasonable needs of children, except for items that are statutorily excluded (such as, for instance, medical expenses and work-related childcare expenses). *See Davis v. Davis*, 2011 UT App 311, ¶ 17, 263 P.3d 520 (noting that medical expenses and work-related childcare expenses have been "singled out" by the legislature as something that "parents are ordered to pay in addition to their regular child support obligations"). "Child-rearing expenses" that are "not statutorily distinguished from regular child support should be considered part and parcel of the child support award." *Id.* (quotation simplified).

¶28    In particular, we have held that "school fees" and "extracurricular activities" are presumed to be included in the "regular child support" payment amount, and ordinarily "must be satisfied, if at all, out of the parties' combined child support obligations." *Id.* ¶¶ 15, 17. Certainly, parties can agree "to share such additional expenses in the interest of their children," but if they are unable to reach agreement on that score, such expenses "must generally be budgeted as part of child support." *Id.* ¶ 15. Thus, in the present case, any expenses associated with the extracurricular activities in which the Fox children participate were designed to be budgeted as part of the $9,760 that DiAnn receives in child support each month.

¶29    Based on *Davis*, then, the trial court would have been on completely solid ground to decline DiAnn's request to include a line item of $855 for "extracurricular activities" in her list of monthly expenses for purposes of the alimony calculation. But the

court went ahead and included that line item in its computation of DiAnn's monthly needs for alimony purposes anyway, effectively giving DiAnn an $855 monthly bump in alimony to which she may not have been entitled.[4]

¶30 DiAnn looks this gift horse quite squarely in the mouth and complains that the court should have given her this bonus payment in a different form: by issuing a separate award—consisting of neither child support nor alimony—commanding Ben to pay the extracurricular expenses. Apparently, she is concerned that, if she remarries, Ben's obligation to pay these expenses will evaporate along with the other alimony line items. Certainly, the trial court *could*—within the wide discretion afforded trial courts in such matters—have made such an award, provided it adequately explained its reasons for doing so. *See id.* ¶ 17 (noting that a court can deviate from the presumptive child support guidelines and order a higher amount designed to include "school fees," but such an order "must be supported by a specific finding on the record supporting the conclusion that use of the guidelines would be unjust, inappropriate, or not in the best interest of the children" (quotation simplified)). But DiAnn falls far short of persuading us that the court abused its discretion by opting not to do so, especially given that she included this line item in her financial declaration, which was the basis for her alimony request. On this basis, we reject DiAnn's second challenge to the court's alimony award.

## II. Marital Debt

¶31 DiAnn next asserts that the trial court abused its discretion when it divided the marital debt in such a way as to give her full

---

4. We note that Ben has not filed a cross-appeal in this case, and does not, by that means or any other, challenge the court's decision to include extracurricular expenses in its computation of DiAnn's monthly needs for alimony purposes.

responsibility for the parties' $181,000 obligation owed to DiAnn's father, and then included a $2,500 line item for payments servicing that debt in DiAnn's alimony award (thereby effectively requiring Ben to pay that debt as part of his alimony obligation). We perceive no abuse of discretion in the trial court's orders regarding the marital debt owed to DiAnn's father.

¶32 In issuing a divorce decree, a trial court must include "an order specifying which party is responsible for the payment of joint debts, obligations, or liabilities of the parties contracted or incurred during marriage." Utah Code Ann. § 30-3-5(2)(c)(i) (LexisNexis Supp. 2021). Importantly, our law requires only "a fair and equitable, not an equal, division of the marital debts." *Sinclair v. Sinclair*, 718 P.2d 396, 398 (Utah 1986) (per curiam). And as already mentioned, because trial courts are in the "best position to weigh the evidence, determine credibility and arrive at factual conclusions, they have considerable latitude" in dividing marital debt, and their actions in this regard "are entitled to a presumption of validity." *Mullins v. Mullins*, 2016 UT App 77, ¶ 20, 370 P.3d 1283 (quotation simplified).

¶33 In the present case, we cannot say that the trial court abused its discretion in assigning the marital debt owed to DiAnn's father to DiAnn. By way of counterbalance, the court assigned Ben full responsibility for his medical school debts (totaling some $145,000), and made each party responsible for the debts on their respective vehicles. This division makes practical sense, because it relieves DiAnn of any responsibility for debts associated with Ben's medical education, and it relieves Ben of any direct responsibility (aside from alimony) for debts owed to DiAnn's father. The court recognized, however, that this distribution of debts gave DiAnn "approximately $24,000 more in debts" than it gave Ben, but the court stated that it would "use its distribution of property to equalize this imbalance of debts." DiAnn makes no argument that the court failed to remedy this imbalance. Indeed, the court awarded the parties' timeshare

condominium in Hawaii to DiAnn alone, and it also awarded DiAnn three of the four cars owned by the parties. Additionally, the court awarded DiAnn an offset of $10,000 "to compensate her for any dissipation of the marital estate" on the part of Ben, and also awarded her $50,000 for attorney fees from any proceeds made from the sale of the marital house *prior to* the parties evenly splitting any remaining proceeds. Under the circumstances presented here, DiAnn has not demonstrated any inequity or abuse of discretion in the manner in which the court divided the parties' marital debts.

¶34 Furthermore, while DiAnn was indeed assigned responsibility for the entire debt owed to her father, a line item for the $2,500 monthly payment of that debt was included in her alimony award. Thus, while the court made DiAnn responsible for that debt, it is Ben, and not DiAnn, who is (at least indirectly) paying for it. DiAnn nevertheless complains about this seemingly favorable arrangement, again expressing concern that, if she were to remarry, Ben's obligation to front her the money to service the debt owed to her father would evaporate along with the other alimony line items. Perhaps a trial court, within the scope of its discretion, could have done what DiAnn envisions. But under the specific facts of this case, it is not an abuse of discretion for the court to have equitably divided the debt, and then to have required Ben to pay DiAnn an alimony amount that includes the debt service payments on the obligation owed to DiAnn's father. Given the circumstances as they existed at the time of trial, DiAnn has not demonstrated that the court's orders regarding the parties' debt to DiAnn's father exceeded the court's wide discretion in such matters.

## III. Voluntary Underemployment

¶35 Finally, DiAnn argues that the trial court abused its discretion when it found, for purposes of calculating child support and alimony, that Ben was not voluntarily

underemployed. Specifically, DiAnn asserts that because Ben took a job in Florida that paid him less than what he had been making in St. George, the court should have concluded that Ben is voluntarily underemployed and should have calculated child support and alimony based on Ben's previous St. George salary.

¶36    As an initial matter, we note that this entire issue is irrelevant to the alimony computation, given our determination (discussed above) that the trial court did not abuse its discretion in making its alimony award. Even using Ben's Florida salary for purposes of computing Ben's income, the trial court found that Ben had the financial ability to make up 100% of the difference between DiAnn's income and her reasonable needs. *See supra* ¶¶ 19, 23–24. Thus, even if we were to agree with DiAnn that Ben was voluntarily underemployed and that the trial court should have used his St. George salary in computing his income, DiAnn's alimony award would not change. But because the issue could still matter to the child support calculation, we proceed to address the merits of DiAnn's challenge to the trial court's findings regarding voluntary underemployment.

¶37    "A court may impute income to an underemployed spouse." *Rayner v. Rayner*, 2013 UT App 269, ¶ 7, 316 P.3d 455 (quotation simplified). In order to do so, however, the court must determine that the spouse "is voluntarily . . . underemployed." *Id.* (quotation simplified). We agree with DiAnn that Ben's employment actions—in taking a new job in Florida—were voluntary. *See id.* ("A spouse is voluntarily unemployed or underemployed when he or she intentionally chooses of his or her own free will to become unemployed or underemployed." (quotation simplified)). But DiAnn has not persuasively demonstrated that the trial court abused its discretion in determining that Ben was not underemployed.

¶38    The determination as to whether a party is underemployed requires examination of all the relevant circumstances, and not

just whether a party's salary has recently dropped. Indeed, a party's "current earnings, as compared to his [or her] historical income, is merely one element in the matrix of factual issues affecting the ultimate finding of whether [a party] is underemployed." *Hall v. Hall*, 858 P.2d 1018, 1026 (Utah Ct. App. 1993); *see also Vanderzon v. Vanderzon*, 2017 UT App 150, ¶ 65, 402 P.3d 219 (stating that "income imputation shall be based upon employment potential and probable earnings as derived from employment opportunities, work history, occupation qualifications, and prevailing earnings for persons of similar backgrounds in the community" (quotation simplified)).

¶39　In the present case, the trial court did not abuse its discretion in finding that Ben was not underemployed. Certainly, Ben's income is lower in Florida than it was in St. George. And a drop in income can be an important factor in determining that a spouse is underemployed. *See, e.g.*, *Arnold v. Arnold*, 2008 UT App 17, ¶ 7, 177 P.3d 89. But the mere fact that a spouse's income has fallen does not necessarily mandate a finding of underemployment.[5] In the present case, the court was presented with ample evidence to support its determination that Ben—despite his lower salary—was not underemployed. Ben had not left his profession—he was employed as a neurosurgeon in St. George, and he was employed as a neurosurgeon in Florida. And even in Florida, Ben still made a lot of money; indeed, Ben's expert testified that Ben's Florida salary—nearly $1 million per year—was above the 90th percentile for *neurosurgeons* nationwide, not

---

5. By way of example, consider the hypothetical case of a successful attorney who leaves private practice to assume a seat in the judiciary. Especially given current market salaries for attorneys in private practice, it is not at all difficult to imagine the attorney experiencing a significant cut in salary upon taking the bench. But it would be hard to describe the hypothetical new judge as being, in any meaningful sense, underemployed.

just for doctors. The trial court also credited Ben's testimony that the work schedule he had been maintaining in St. George was not sustainable, and that he was "over-worked and burnt out." And in Florida, Ben was still working 50 to 60 hours per week, up to half again as much as a typical full-time job. All of this evidence supports the court's finding that Ben was not underemployed, voluntarily or otherwise.

¶40    Under these circumstances, we cannot say the court abused its discretion in finding that Ben was not voluntarily underemployed. While the court's determination was perhaps not the only permissible one under the circumstances, it is "entitled to a presumption of validity," *Mullins v. Mullins*, 2016 UT App 77, ¶ 20, 370 P.3d 1283 (quotation simplified), was supported by competent evidence, and did not constitute an abuse of discretion.

CONCLUSION

¶41    We perceive no abuse of the trial court's discretion in its alimony award, its division of marital debts, or its determination that Ben was not voluntarily underemployed. On that basis, we reject DiAnn's appellate challenges.

¶42    Affirmed.

_____